Mario ECHAZABAL, Plaintiff–
Appellant,

v.

CHEVRON USA, INC.; Irwin
Industries, Inc., Defendant–
Appellee.

No. 98–55551.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1999.

Submission Vacated Nov. 15, 1999.

Resubmitted Jan. 25, 2000.

Filed May 23, 2000.

Amended Sept. 26, 2000.

Larry Minsky, Sievers & Minsky, Long Beach, California, for the plaintiff-appellant.

Jon P. Kardassakis, Hawkins, Schnabel, Lindahl & Beck, Los Angeles, California, for the defendant-appellee.

Before: BRIGHT,* REINHARDT, and TROTT, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge TROTT.

## ORDER

The Opinion filed on May 23, 2000 is amended to include the attached dissent by Judge Trott.

## OPINION

REINHARDT, Circuit Judge:

On this appeal, the principal question we consider is whether the "direct threat" defense available to employers under the Americans with Disabilities Act applies to employees, or prospective employees, who pose a direct threat to their own health or safety, but not to the health or safety of other persons in the workplace. We conclude that it does not.

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

## I.

Mario Echazabal first began working at Chevron's oil refinery in El Segundo, California in 1972. Employed by various maintenance contractors, he worked at the refinery, primarily in the coker unit, nearly continuously until 1996, when the events that gave rise to this litigation occurred.

In 1992, Echazabal applied to work directly for Chevron at the same coker unit location. After determining that he was qualified for the job, Chevron extended him an offer contingent on his passing a physical examination. A preemployment physical examination conducted by Chevron's regional physician revealed that Echazabal's liver was releasing certain enzymes at a higher than normal level. Based on these results, Chevron concluded that Echazabal's liver might be damaged by exposure to the solvents and chemicals present in the coker unit. For that reason, Chevron rescinded its job offer. Nevertheless, Echazabal continued to work for Irwin, a maintenance contractor, throughout the refinery—including at the coker unit. Chevron made no effort to have him removed from his assignment.

After learning of the enzyme test results, Echazabal consulted with several doctors and eventually was diagnosed with asymptomatic, chronic active hepatitis C. Throughout his treatment, Echazabal told each physician who treated him about the type of work that he did. In addition, at least one of his physicians was provided with a document that detailed the specific environmental hazards present in the vicinity of the coker unit at the refinery. None of these physicians advised Echazabal that he should stop working at the refinery because of his medical condition.

In 1995, Echazabal again applied to Chevron for a position at the coker unit.

As it had done before, Chevron made Echazabal a job offer that was contingent upon his passing a physical examination. Once again, Chevron eventually rescinded its job offer on the ground that there was a risk that Echazabal's liver would be damaged if he worked at the coker unit. Unlike in 1992, however, Chevron did not simply allow Echazabal to continue working for Irwin at the refinery. Instead, Chevron wrote Irwin and asked that it "immediately remove Mr. Echazabal from [the] refinery or place him in a position that eliminates his exposure to solvents/chemicals." As a result, Echazabal was no longer permitted to work at the Chevron refinery.

Immediately after losing his position at the refinery, Echazabal filed a complaint with the Equal Employment Opportunity Commission. He subsequently filed a complaint in state court that alleged, among other things, that both Chevron and the maintenance contractor had discriminated against him on the basis of a disability, in violation of the Americans with Disabilities Act (ADA). After Chevron removed the action to federal court, the district court granted Chevron's motion for summary judgment on all of Echazabal's claims. The court then stayed the proceedings between Echazabal and the maintenance contractor (it had denied the contractor's summary judgment motion) and certified for appeal its grant of summary judgment in favor of Chevron.[1]

## II.

■ On appeal, Chevron argues that it may defend its decision not to hire Echazabal on the ground that it reasonably concluded that Echazabal would pose a direct threat to his own health if he

1. The district court also certified for appeal three other claims by Echazabal on which it granted summary judgment for Chevron: a Rehabilitation Act claim, a claim under California's Fair Employment and Housing Act, and a claim that Chevron intentionally interfered with Echazabal's employment contract with the contractor for whom he worked. As

we discuss below, *see infra* note 13, in this opinion we vacate the district court's grant of summary judgment as to the first two of these claims. In a separate memorandum disposition filed concurrently herewith, we also reverse the district court's grant of summary judgment with respect to the intentional interference with contract claim.

worked at the refinery. It acknowledges that, with respect to "otherwise qualified" individuals, the ADA prohibits employers from "using qualification standards . . . that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(6) (1994); *see also* 42 U.S.C. § 12113(a). Chevron contends, however, that its refusal to hire Echazabal falls under an affirmative defense that the ADA provides to this charge of discrimination. In the "defenses" section of the Act, the statute provides that an employer may impose, as a "qualification standard," "a requirement that an individual shall not pose a direct threat to the health or safety of *other individuals* in the workplace." 42 U.S.C. § 12113 (emphasis added).[2]

The question before us is whether the "direct threat" defense includes threats to one's own health or safety. That is, we must decide whether the provision permits employers to refuse to hire an applicant on the ground that the individual, while posing no threat to the health or safety of other individuals in the workplace, poses a direct threat to his own health or safety. As we noted recently in *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243 (9th Cir. 1999), "[w]e have not yet ruled on whether the direct threat defense includes threats to one's self."[3]   *Id.* at 1247 n. 1. In

addition to being a question of first impression in this Circuit, the issue has received almost no treatment in other Circuits. While several cases do state, in passing dicta, that the direct threat defense includes threats to oneself, *see La-Chance v. Duffy's Draft House, Inc.*, 146 F.3d 832 (11th Cir.1998); *EEOC v. Amego, Inc.*, 110 F.3d 135 (1st Cir.1997); *Daugherty v. City of El Paso*, 56 F.3d 695 (5th Cir.1995), only the Eleventh Circuit appears to have held that the defense encompasses such threats. *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir.1996). The *Moses* court provides us with no guidance, however, because it gives no explanation for its holding. Instead, it simply asserts, without analysis, that the ADA's direct threat defense applies to threats to the disabled individual himself.[4]

In order to resolve the scope of the direct threat defense, we turn first to the language of provision itself. Here, that language is dispositive. The direct threat defense permits employers to impose a "requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." On its face, the provision does not include direct threats to the health or safety of the disabled individual himself. Moreover, by specifying only threats to "other individu-

**2.** The defenses section of Title I of the ADA reads in relevant part:
   (a) In general
   It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.
   (b) Qualification standards
   The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.
   . . . .
   42 U.S.C. § 12113. The subsection that sets forth the "direct threat" language does not

explicitly set forth an affirmative defense to a claim of disability discrimination. Nevertheless, it is clear that Congress intended the provision to define the terms of such defense.

**3.** We asked the parties and the amicus EEOC to be prepared to discuss, at oral argument, whether the direct threat defense includes threats to oneself. Following argument, we invited the parties and the EEOC to submit briefs on the question. While the parties submitted such briefs, the EEOC advised us that it did not wish to do so.

**4.** A district court in the Seventh Circuit has examined the question in detail. It concluded, as do we, that the direct threat defense does not apply to threats to oneself. *See Kohnke v. Delta Airlines, Inc.*, 932 F.Supp. 1110 (N.D.Ill.1996).

als in the workplace," the statute makes it clear that threats to other persons—including the disabled individual himself—are not included within the scope of the defense.[5] *Expressio unius est exclusio alterius.* Finally, the obvious reading of the direct threat defense as not including threats to oneself is supported by the definitional section of Title I, which states that "[t]he term 'direct threat' *means* a significant risk to the health or safety *of others* that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3) (emphasis added). The fact that the statute consistently defines the direct threat defense to include only threats to others eliminates any possibility that Congress committed a drafting error when it omitted from the defense threats to the disabled individual himself. *Cf. United States Trustee v. Garvey, Schubert & Barer (In re Century Cleaning Servs., Inc.),* 195 F.3d 1053, 1057–58 (9th Cir.1999). For these reasons, we conclude that the language of the direct threat defense plainly does not include threats to the disabled individual himself.

Although we need not rely on it, the legislative history of the ADA also supports the conclusion that the direct threat provision does not include threats to oneself. The term "direct threat" is used hundreds of times throughout the ADA's legislative history—in the final conference report, the various committee reports and hearings, and the floor debate. *See, e.g.,* H.R. Conf. Rep. No. 101–596, at 57, 60, 77, 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 566, 569, 586, 593. In nearly every instance in which the term appears, it is accompanied by a reference to the threat to "others" or to "other individuals in the workplace." Not once is the term accom-

panied by a reference to threats to the disabled person himself. In addition, both the Report of the House Judiciary in the Report of the Committee on Education and Labor explain that the direct threat provision is intended to codify the Supreme Court's holding in *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)—a case that defines "[t]he term 'direct threat' [to] mean[ ] a significant risk to the health or safety *of others* that cannot be eliminated by reasonable accommodation." H.R.Rep. No. 101–485, pt. 3, at 34, 45–46 (1990) (emphasis added) (citing *Arline* ), *reprinted in* 1990 U.S.C.C.A.N. 445, 457; *see also* H.R.Rep. No. 101–485, pt. 2, at 76, *reprinted in* 1990 U.S.C.C.A.N. 303, 359. While the House Judiciary Report notes that the ADA extends the *Arline* standard "to all individuals with disabilities, and not simply to those with contagious diseases or infections," H.R.Rep. No. 101–485, pt. 3, at 45, *reprinted in* 1990 U.S.C.C.A.N. 445, at 468, it says nothing about extending the standard to cover a disabled person whose employment would be harmful to himself as opposed to other individuals. Finally, the following statement made by Senator Kennedy, a co-sponsor of the ADA, also strongly bolsters our reading of the statute:

> The ADA provides that a valid qualification standard is that a person not pose a direct threat to the health or safety of other individuals in the workplace-that is, to other coworkers or customers. . . . It is important, however, that the ADA specifically refers to health and safety threats to others. Under the ADA, employers may not deny a person an employment opportunity based on paternal-

---

5. It is true that, in the Eleventh Amendment context, the Supreme Court has rejected a similar textual argument. Although the Eleventh Amendment specifies only that "citizens of *another* state" may not sue a state, the Court has held that states are immune from suit by citizens of the *same* state. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504,

33 L.Ed. 842 (1890). *But see Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989); U.S. Const. amend. XI. Regardless of the merits of the Court's interpretation of the Eleventh Amendment, we decline to follow a similar approach here or to adopt so atextual a reading of the direct threat defense. Rather, we prefer to afford the statute its plain meaning.

istic concerns regarding the person's health. For example, an employer could not use as an excuse for not hiring a person with HIV disease the claim that the employer was simply "protecting the individual" from opportunistic diseases to which the individual might be exposed. That is a concern that should rightfully be dealt with by the individual, in consultation with his or her private physician.

136 Cong. Rec. S9684–03, at S9697 (1990).[6] In short, the legislative history convincingly supports the unambiguous wording of the direct threat defense.

■ Congress's decision not to include threats to one's own health or safety in the direct threat defense makes good sense in light of the principles that underlie the ADA in particular and federal employment discrimination law in general. As Senator Kennedy noted in the statement quoted above, the ADA was designed in part to prohibit discrimination against individuals with disabilities that takes the form of paternalism. This goal is codified in the Act itself: in the "Findings" section of the ADA, Congress concluded that "overprotective rules and policies" are one form of discrimination confronting individuals with disabilities. 42 U.S.C. § 12101(a)(5); *see also* H.R.Rep. No. 101–485, pt. 2, at 74, *reprinted in* 1990 U.S.C.C.A.N. 303, 356 (noting that "[p]aternalism is perhaps the most pervasive form of discrimination for people with disabilities").

More generally, courts have interpreted federal employment discrimination stat-utes to prohibit paternalistic employment policies. The Supreme Court's interpretation of Title VII in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and *International Union, United Auto. Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), provides a good example of this principle. In *Dothard,* the Court stated that "[i]n the usual case, the argument that a particular job is too dangerous for women may appropriately be met by the rejoinder that it is the purpose of Title VII to allow the individual woman to make that choice for herself." 433 U.S. at 335, 97 S.Ct. 2720. While the Court permitted the employer in that case to hire only male guards in contact areas of maximum security male penitentiaries, it did so only because more was at stake than the "individual woman's decision to weigh and accept the risks of employment." *Id.* Sex was a bona fide occupational qualification, the Court concluded, because the employment of a female guard would, due to the guard's sex, create a real threat to the safety to *others* if violence broke out. *See id.* at 336, 97 S.Ct. 2720. In *Johnson Controls,* the Court reiterated "that danger to a woman herself does not justify discrimination." 499 U.S. at 202, 111 S.Ct. 1196 (citing *Dothard* ). The court there held that the threats of lead exposure to female employees' own reproductive health did not justify the employer's decision to exclude women from certain positions at a battery manufacturing plant. *See id.* at 206–07, 111 S.Ct. 1196. Given Congress's

---

**6.** We found but one discussion in the legislative history that could be read as contrary to the plain reading of the direct threat defense. The report of the House Committee on Education and Labor contains the following somewhat ambiguous passage:

> A candidate, undergoing a post-offer, preemployment medical examination may not be excluded, for example, solely on the basis of an abnormality on an x-ray. However, if the examining physician found that there was high probability of substantial harm if the candidate performed the particular functions of the job in question, the employer could reject the candidate . . .

H.R.Rep. No. 101–485, pt. 2, at 73–74, *reprinted in* 1990 U.S.C.C.A.N. 303, 355–56. The quoted language does not make it clear to whom such "substantial harm" might occur. In any event, this general discussion does not take place in the context of discussing the direct threat defense. When the House Committee report does discuss the direct threat defense specifically, it, like the other reports, states that the defense codifies the standard set forth by the Supreme Court in *Arline.* In the end, the evidence provided by this isolated passage is vastly outweighed by the substantial evidence to the contrary that appears throughout the legislative history.

decision in the Title VII context to allow all individuals to decide for themselves whether to put their own health and safety at risk, it should come as no surprise that it would enact legislation allowing the same freedom of choice to disabled individuals.

■■■ Chevron makes two arguments as to why the direct threat provision should not be given its plain meaning. First, Chevron argues that we should defer to the EEOC's contrary interpretation of the ADA. The implementing regulations of Title I of the ADA promulgated by the EEOC do, as Chevron contends, state that an employer may assert a "direct threat" defense with respect to individuals who pose a threat only to their own health or safety.[7] *See* 29 C.F.R. § 1630.15(b)(2) (1999) ("The term 'qualification standard' may include a requirement that an individual shall not pose a direct threat to the health or safety of *the individual* or others in the workplace." (emphasis added)); 29 C.F.R. § 1630.2(r). Our determination whether a particular regulatory provision is valid begins with an inquiry into whether we must defer to the agency's construc-

tion, and if so, what level of deference the agency interpretation is owed. In the present case, we need not determine what level of deference Title I regulations are due, because we would reject the EEOC's regulatory interpretation of the statutory "direct threat" provision even were we to conclude that *Chevron* deference is appropriate.[8] Under *Chevron*, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir.1999). As we concluded above, the intent of Congress is clear: the language of the direct threat defense plainly expresses Congress's intent to include within the scope of a § 12113 defense only threats to other individuals in the workplace. Accordingly, we reject the EEOC's contrary interpretation.

■ Second, Chevron suggests that we must ignore Congress's clear intent because forcing employers to hire individuals

---

7. While we invited the EEOC, as amicus, to file a brief commenting on the validity of its regulatory interpretation, it declined to do so. *See supra* note 3.

8. While we need not decide what level of deference the regulations implementing Title I are due, we note that Congress explicitly required the EEOC to issue regulations implementing Title I. *See* 42 U.S.C. § 12116 ("Not later than 1 year after July 26, 1990, the Commission shall issue regulations in an accessible format to carry out this subchapter [Title I]...."). *Chevron* sets forth the level of deference that "should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. In fact, with respect to Title II of the ADA, we have held that *Chevron* governs review of regulations promulgated by the Attorney General because "Congress required the Attorney General to promulgate regulations implementing Title II." *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1172–73 (9th Cir. 1999); *see also Dare v. California*, 191 F.3d 1167, 1172 (9th Cir.1999); *Does 1–5 v. Chandler*, 83 F.3d 1150, 1153 (9th Cir.1996).

The regulations implementing Title I of the ADA present a different deference question than that confronted by the Supreme Court in its recent ADA decisions. In *Sutton* and *Kirkingburg*, the Supreme Court reserved the question whether, and to what extent, the regulations and interpretive guidance "promulgated by the EEOC relating to the ADA's definitional section, 42 U.S.C. § 12102," are entitled to deference. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 2167 n. 10, 144 L.Ed.2d 518 (1999); *see also Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999); *Broussard v. University of Cal., at Berkeley*, 192 F.3d 1252, 1256 n. 2 (9th Cir. 1999) (reserving same question). As the Supreme Court specifically noted, however, "[n]o agency ... has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see §§ 12101–12102, which fall outside Titles I–V." *Sutton*, 119 S.Ct. at 2145. Unlike the generally applicable provisions considered in *Kirkingburg* and *Sutton*, Title I contains an explicit grant of regulatory authority to the EEOC.

who pose a risk to their own health or safety would expose employers to tort liability. Because Chevron has not argued that it faces any costs from tort liability, this question is not properly before us. *See Johnson Controls,* 499 U.S. at 210, 111 S.Ct. 1196. Nevertheless, we should note that, in *Johnson Controls,* the Supreme Court strongly suggested that state tort law would be preempted to the extent that it interfered with federal antidiscrimination law. The Court stated that "we have not hesitated to abrogate state law where satisfied that its enforcement would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Johnson Controls,* 499 U.S. at 209–10, 111 S.Ct. 1196 (internal quotation marks omitted). Therefore, given that the ADA prohibits employers from refusing to hire individuals solely on the ground that their health or safety may be threatened by the job, state tort law would likely be preempted if it interfered with this requirement. Moreover, we note that Chevron's concern over an award of damages reflects a fear that hiring a disabled individual will cost more than hiring an individual without any disabilities. The extra cost of employing disabled individuals does not in itself provide an affirmative defense to a discriminatory refusal to hire those individuals. *See, e.g.,* 42 U.S.C. § 12112(b)(5)(A) (requiring employers to accommodate disabled individuals, even when those accommodations impose additional costs, unless the employer can demonstrate that the accommodations "would impose an undue hardship on the operation of the business").

█ In short, the plain language of the direct threat provision is dispositive: Section 12113 does not afford a defense on the basis that the performance of a job would pose a direct threat to an employee's (or prospective employee's) own health or safety. *See* 42 U.S.C. § 12113.

## III.

█ Chevron next contends that, even if the direct threat provision does not provide it with a defense to its actions, it may

defend its decision not to hire Echazabal on the ground that, because of the risk of damage to his liver, he is not "otherwise qualified" to perform the job at issue. Put simply, Chevron's argument is that the § 12113 "direct threat" defense does not set forth the exclusive way in which it may defend its decision not to hire Echazabal because of the risk to his health.

We agree, of course, that the ADA does not require employers to hire individuals who are not "otherwise qualified." Only a person who is a "qualified individual with a disability" is protected from discrimination under the ADA. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...."). According to the Act, the term "qualified individual with a disability" means:

> [A]n individual with a disability who, with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8) (emphasis added).

We do not agree, however, with Chevron's assertion on appeal that performing the work at the coker unit *without posing a threat to one's own health or safety* is an "essential function" of the coker unit job. Chevron argues that it is an essential function because "the record establishes that Chevron did prepare a written description of the job before advertising it and it incorporated the need for an employee to be able to tolerate an environment including, among other things, hydrocarbon liquids and vapors, petroleum, solvents and oils." According to Chevron, the "requirement" of the job description that an em-

ployee not be susceptible to harm from the chemicals is an "essential function" of the job simply because Chevron has chosen to describe it as such.

▇▇▇▇▇ While we give consideration to an employer's judgment as to what functions of a job are essential, *see* 42 U.S.C. § 12111(8), an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description. Job functions are those acts or actions that constitute a part of the performance of the job. "The job" at the coker unit is to extract usable petroleum products from the crude oil that remains after other refining processes. The job functions of the "plant helper" position for which Echazabal applied consist of various actions that help keep the coker unit running. Chevron does nothing

more than add a prohibited condition to these actual job functions when it asserts that the job functions at the coker unit consist of performing the actions that help keep the unit running *without posing a risk to oneself.* Were we to ignore the limits of the actual functions of the job at issue and permit Chevron to add to those functions any condition it chooses to impose in its written job description, the term "essential function" would be rendered meaningless.[9] Moreover, Chevron's reading of "essential functions" would, by definitional slight-of-hand, circumvent Congress's decision to exclude a paternalistic risk-to-self defense in circumstances in which an employee's disability does not prevent him from performing the requisite work. Accordingly, we reject Chevron's interpretation of what may constitute an "essential function" of a job.[10]

9. Chevron's argument is markedly similar to the argument made by the dissent in *Johnson Controls* regarding the word "occupation" in the term "bona fide occupational qualification," as used in Title VII of the Civil Rights Act. *See Johnson Controls*, 499 U.S. at 211 n. 1, 111 S.Ct. 1196 (White, J., concurring); *id.* at 201, 111 S.Ct. 1196. In *Johnson Controls*, the majority rejected the dissent's interpretation, *see id.* at 201, 203–04, 111 S.Ct. 1196, and described the fallacy of the argument as follows: "It is word play to say that 'the job' at Johnson [Controls] is to make batteries without risk to fetuses in the same way 'the job' at Western airlines is to fly planes without crashing." *Johnson Controls*, 499 U.S. at 207, 111 S.Ct. 1196 (quoting *Johnson Controls*, 886 F.2d 871, 913 (7th Cir.1989) (Easterbrook, J., dissenting)).

10. Chevron argues that, in spite of the fact that it would undermine the clear language of the ADA's direct threat provision, we should conclude that a personal safety requirement is a valid qualification standard because such a conclusion is supported by case law implementing the Rehabilitation Act. It is true that at least one Ninth Circuit Rehabilitation Act case appears to conclude that a disabled individual is not a "qualified handicapped person" if her employment would pose "a reasonable probability of substantial harm" to her. *Mantolete v. Bolger*, 767 F.2d 1416, 1422–24 (9th Cir.1985) (stating that a risk to self may prevent an individual from being "qualified," but holding that the district court applied a standard too lenient when it found

that, because the individual's employment would pose "an elevated risk of injury," she was not a qualified handicapped person). *But cf. Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 622–23 & n. 3 (9th Cir.1982) (questioning, under the Rehabilitation Act, whether a risk of future injury to self would be "related to the performance of the job and ... consistent with business necessity," but declining to "hold that a non-imminent risk of injury cannot justify rejecting a handicapped individual").

*Mantolete* does not affect our analysis, however, because it relies on a Rehabilitation Act regulation that is irrelevant to our inquiry. The *Mantolete* court relied on a Rehabilitation Act regulation that defined a "qualified handicapped person" as an individual who, among other things, is able to "perform the essential functions of the position in question without endangering the health and safety of *the individual* or others." 29 C.F.R. § 1613.702(f) (emphasis added); *see also Mantolete*, 767 F.2d at 1421. The Rehabilitation Act did not provide a statutory definition of the term "qualified handicapped person." Thus, the court deemed the regulations controlling. In contrast to the Rehabilitation Act, the ADA contains a statutory definition of the term "qualified individual with a disability," which is the ADA's equivalent of the Rehabilitation Act's "qualified handicapped person." *See* 42 U.S.C. § 12111(8). The statutory definition in the ADA does not mention threats to the health or safety of the individual or others.

Given that·not posing a risk to one's own health or safety cannot in itself constitute an essential job function, it is clear that Chevron's reason for refusing to hire Echazabal is not related to Echazabal's ability to perform the essential functions of the job for which he applied.[11] Chevron has never contended that the risk Echazabal allegedly poses to his own health renders him unable to perform those duties. Nor would we accept such an argument in this case were Chevron to make it. Echazabal worked for Irwin at the coker unit, performing work similar to the job for which he applied, long after he was diagnosed with hepatitis. There is no evidence that the health of his liver ever affected his ability to do the job. Had Echazabal failed during that period to perform the essential functions of his work, we seriously doubt that Chevron would have twice extended him contingent offers to work at the coker unit.

Accordingly, we hold that the risk that Echazabal's employment might pose to his own health does not affect the question whether he is a "qualified individual with a disability."

## IV.

For the foregoing reasons, we conclude that the ADA's direct threat defense means what it says: it permits employers to impose a requirement that their employees not pose a significant risk to the health or safety of other individuals in the workplace. It does not permit employers to shut disabled individuals out of jobs on the ground that, by working in the jobs at issue, they may put their own health or safety at risk. Conscious of the history of paternalistic rules that have often excluded disabled individuals from the workplace, Congress concluded that disabled persons should be afforded the opportunity to decide for themselves what risks to undertake. The district court's grant of summary judgment to Chevron on Echazabal's ADA claim is reversed.[12]

Rather, it requires only that the individual be able, with or without reasonable accommodation, to "perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Obviously, the ADA's statutory definition of the term "qualified individual with a disability" supercedes the Rehabilitation Act's regulatory definition of the analogous term.

**11.** In the context of threats to *others*, as opposed to threats to self, a few circuits have addressed employer claims that a threat that an individual posed to others prevented that person from performing the essential functions of the job at issue. *See EEOC v. Amego, Inc.*, 110 F.3d 135, 142–44 (1st Cir.1997); *EEOC v. Exxon Corp.*, 203 F.3d 871, 873–75 (5th Cir.2000). Because these decisions deal with threats to others, they are irrelevant to our analysis.

**12.** As noted above, the district court also certified for appeal its grant of summary judgment in favor of Chevron on the Rehabilitation Act and FEHA claims. In granting Chevron summary judgment with respect to those claims, however, the district court treated the substantive standards for liability under all three statutes as identical. We note that this conclusion may well be correct with respect to the Rehabilitation Act. In 1992, Congress amended the relevant provision of the Rehabilitation Act—section 504—by adding the following subsection:

The standards used to determine whether this section has been violated in a complaint alleging employment.discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201–12204 and 12210), as such sections relate to employment.

Rehabilitation Act Amendments of 1992, Pub.L. No. 102–569, § 506, 106 Stat. 4344, 4428 (amendments codified at 29 U.S.C. § 794(d)). Thus, our reversal as to the ADA claim may well require reversal with respect to the Rehabilitation Act claim. Nevertheless, we leave it to the district court to determine initially whether summary judgment should be granted to Chevron as to the Rehabilitation Act and FEHA claims. Accordingly, we vacate the district court's grant of summary judgment with respect to those claims, and remand for reconsideration in light of our decision. In addition, because we reverse the district court's grant of summary judgment as to the ADA claim and vacate its grant of summary judgment as to the Rehabilitation Act and FEHA claims, we also reverse the district court's judgment that Echazabal's claim for punitive damages is moot.

REVERSED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

TROTT, Circuit Judge, dissenting:

Mario Echazabal sues over not getting a job handling liver-toxic substances, i.e., "hydrocarbon liquids and vapors, acid, caustic, refinery waste water and sludge, petroleum solvents, oils, greases, and chlorine bleach." He was denied the job because he suffers from a chronic, uncorrectable, and life-threatening viral liver disease—Hepatitis C—that most likely will be aggravated by exposure to these hazardous materials to the extent that his life will be endangered.

Chevron first discovered Mr. Echazabal's condition in 1992 when he was examined by Dr. Philip Bailey. Dr. Bailey studied toxicology at the University of Texas and is Board Certified in preventative occupational medicine. Dr. Bailey concluded on the basis of an examination of Mr. Echazabal and lab tests that his liver function was "grossly abnormal" and that he should not be exposed to liver toxic chemicals or alcohol. Dr. Bailey's findings and conclusions were recorded in Chevron's records.

Some years later, on December 28, 1995, Chevron offered Mr. Echazabal a job in its El Segundo refinery, but the offer was contingent on the results of a standard pre-employment physical examination. Enter Dr. Kenneth McGill, Dr. Bailey's successor. As had Dr. Bailey, Dr. McGill worked at the refinery clinic and was familiar with the conditions and demands of the work at issue. On the basis of a thorough medical examination and a review of blood tests, Dr. McGill determined that the chemicals and solvents to which Mr. Echazabal would be exposed at the refinery would further damage his reduced liver capacity and seriously endanger his health and his life. About this concern, Dr. McGill consulted by telephone with Mr. Echazabal's personal treating physician, Dr. Zelman Weingarten. Dr. Weingarten reported to Dr. McGill that extended Interferon therapy had not cleared his

patient's condition, and that exposure to hepatotoxic hydrocarbons was not recommended. Then, Dr. McGill discussed his findings and conclusions ˉwith Dr. T.L. Bridge, Chevron's Medical Director in San Francisco. Dr. Bridge agreed with Dr. McGill's and Dr. Bailey's assessments that Mr. Echazabal could not safely work as a plant helper in the coker unit at the refinery. Not a single doctor disagreed with this conclusion. Mr. Echazabal did not offer any evidence or information to the contrary. Accordingly, and because Mr. Echazabal did not pass the required physical examination for the job, the offer of employment was withdrawn.

Dr. Brian Tang, a separate medical specialist in occupational medicine subsequently hired by his immediate employer Irwin Industries, also came to the conclusion that Mr. Echazabal has a condition that will be "worsened by ... exposure [to hepatotoxins], causing probable death." Eight laboratory tests support the doctors' reasonable medical judgment and Chevron's objective, individualized, and sensible decision not to give Mr. Echazabal the job. He now brings to court facially competing information, but this information was not in Chevron's hands when they made the decision he now claims is actionable. In fact, the information did not surface until this lawsuit, rendering it suspect at best. As we held in *Cook v. United States Dept. of Labor*, 688 F.2d 669 (9th Cir.1982), medical evidence that surfaces after the decision has been made is of no moment in this context regarding the bona fides of the decision itself. What is at issue here is the manner in which Chevron made its decision, not whether lawyers could later find another doctor to say something else.

I agree with the district court that Mr. Echazabal has no case, and I do so for two primary reasons. First, Mr. Echazabal simply is not "otherwise qualified" for the work he seeks. Why? Because the job most probably will endanger his life. I do not understand how we can claim he can perform the essential functions of the posi-

tion he seeks when precisely because of his disability, those functions may kill him. To ignore this reality is bizarre. The EEOC's relevant regulation provides that "the term 'qualification standard' may include a requirement that an individual shall not pose a direct threat to the health or safety of the individual or others in the workplace." 29 C.F.R. § 1630.15(b)(2).

Our law books, both state and federal, overflow with statutes and rules designed by representative governments to protect workers from harm. Long ago we rejected the idea that workers toil at their own peril in the workplace. "Paternalism" here is just an abstract out-of-place label of no analytical help. Whether paternalism or maternalism, the concept is pernicious when it is allowed to dislodge long-standing laws mandating workplace safety. That battle was fought and lost long ago in our legislatures. In many jurisdictions, it is a crime knowingly to subject workers to life-endangering conditions. California Labor Code § 6402 expressly forbids an employer from putting an employee in harms way. In Arizona, an employer who fails to provide a safe workplace commits a felony. Ariz. Rev. Stats. Annot., Labor § 24–403, § 23–418. In effect, we repeal these laws with respect to this appellant, and to other workers in similar situations. So much for OSHA. Now, our laws give *less* protection to workers known to be in danger than they afford to those who are not. That seems upside down and backwards. Precisely the workers who need protection can sue because they receive what they need.

Second, Chevron has a defense to this action, known as the "direct threat" defense. 42 U.S.C. § 12113(b). The EEOC's implementing regulations, authorized by Congress, defines a "direct threat" to mean "a significant risk of substantial harm to the health or safety of *the individual* or others that cannot be reduced by reasonable accommodation...." 29 C.F.R. § 1630.2(r) (Emphasis added). The EEOC's own *Technical Assistance Manual* on the employment provisions of the ADA states: "The ADA recognizes

legitimate employer concerns and the requirements of other laws for health and safety in the workplace. An employer is not required to hire or retain an individual who would pose a 'direct threat' to health or safety." EEOC, *Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* § 4.4 (1992).

On these issues, the EEOC has rationally and humanely spoken. Under *Chevron U.S.A. v. Natural Resources Defense*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we owe deference to the EEOC's interpretation of the Act, but we have failed to acknowledge this responsibility. Contrary to what some might believe, we do not know more about this subject than the EEOC. Following the EEOC's guidance, Mr. Echazabal is not qualified for this work.

Chevron correctly points out that the majority's holding leads to absurd results: a steelworker who develops vertigo can keep his job constructing high rise buildings; a power saw operator with narcolepsy or epilepsy must be allowed to operate his saw; and a person allergic to bees is entitled to be hired as a beekeeper. The possible examples of this Pickwickian ruling are endless. I doubt that Congress intended such a result when it enacted laws to protect persons with disabilities.

The ADA provides a defense to employers who can demonstrate that an accommodation constitutes an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). I believe it would be an undue hardship to require an employer to place an employee in a life-threatening situation. Such a rule would require employers knowingly to endanger workers. The legal peril involved is obvious, and a simple human to human matter, such a moral burden is unconscionable.

The idea that conflicting responsibilities under different labor laws will be solved down the long, expensive, and unpredictable litigation road by the doctrine of implied preemption seems highly pernicious in this context, and a thin reed at best.

Did Congress really intend to nullify state and federal workplace safety laws and render them impotent to protect workers in identifiable harms way? I doubt it. Does anti-paternalism trump basic safety concerns? This entire construct makes a house of cards look secure.

Finally, and fortunately, we have created a conflict with the Eleventh Circuit, which held that "an employer may fire a disabled employee if the disability renders the employee a 'direct threat to his own health or safety.'" *Moses v. American Nonwovens, Inc.*, 97 F.3d 446 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997). I say "fortunately" because this conflict will compel the Supreme Court—or Congress—to resolve this dispute—unless we do so ourselves by way of en banc review.