**MONTANA WILDERNESS ASSOCIATION INC., Friends of the Bitterroot, Inc., and American Wildlands, Inc., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, Hal Salwasser, Regional Forester for Region One, U.S. Forest Service, Jack Ward Thomas, Chief, U.S. Forest Service, Defendants,**

and

**Blue Ribbon Coalition, Inc.; Montana Snowmobile Association; Montana 4X4 Association; High Country Trail Vehicle Riders Association; Rimrock 4X4, Inc.; Montana High Country Tours; Bitterroot Adventures; and Sneed's Cycle and Sled, Defendant–Intervenors,**

and

**Middlefork Property Owners Association, Defendant–Intervenor.**

**No. CV 96–152–M–DWM.**

United States District Court, D. Montana, Missoula Division.

May 21, 2001.

Jack R. Tuholske, Attorney at Law, Missoula, MT, for Montana Wilderness Association, Inc., Friends of the Bitterroot, Inc., American Wildlands, Inc., plaintiffs.

Deanne L. Sandholm, Office of the U.S. Attorney, Helena, MT, for United States Forest Service, an agency of the U.S. Department of Agriculture, Dan Glickman, Secretary of the U.S. Department of Agriculture, Hal Salwasser, Regional Forester for Region One, U.S. Forest Service, Jack Ward Thomas, Chief, U.S. Forest Service, defendants.

## ORDER

MOLLOY, Chief Judge.

### I.  Introduction

The question in this case concerns the Forest Service's duties under the Montana Wilderness Study Act of 1977.  The question arises because the Congress acted with the express intention of further legislating, an intention that has not reached fruition for a myriad of reasons.

The 1977 Act created several Wilderness Study Areas in Montana involving nearly a million acres of land. Within these areas of wilderness study, the Forest Service has implemented diverse management plans and techniques for land use. In nearly a quarter of a century of management, use, and access to the lands in question, there have been changes and increased use. Plaintiffs contend that the Forest Service must not allow increased use of snowmobiles and all-terrain vehicles in Montana's Wilderness Study Areas if such increased use diminishes the wilderness quality of those areas as they existed in 1977. The nature of the Forest Service's duty is complicated by the fact that Congress intended to reach a final decision on wilderness designation of these areas by 1984. The problem is that Congress did act, and did so unequivocally, but Congress' intent to finalize its intention by either designating the lands as Wilderness or releasing them for other use has never happened.

Thus, for the Forest Service, a relatively short-term management task has burgeoned into a seemingly perpetual dilemma. Non-motorized users complain of "creeping motorization"; motorized users fear "creeping designation."

*The Complaint*

Plaintiffs filed an eleven-count Complaint on October 9, 1996, alleging, in effect, that the Forest Service "unlawfully or unreasonably delayed action" or abused its discretion, 5 U.S.C. § 706(1), (2)(A), by failing to maintain the wilderness character of the nine Wilderness Study Areas created in 1977 by the passage of S. 393, the Montana Wilderness Study Act (Pub.L. No. 95–150, 91 Stat. 1243 (Nov. 1, 1977)). After discussion among the parties and with the Court, Counts IV, V, VII, and VIII were considered subsumed in Count I and Plaintiff agreed to their dismissal on that basis. Order of February 13, 1998, at

11, 12–13. Count II, concerning the Sapphire Wilderness Study Area, part of Count IX, and Count X were dismissed for failure to exhaust administrative remedies. *Id.* at 5–10, 13. Count XI became superfluous when I determined that Counts I, III, VI, and IX were reviewable under the Administrative Procedures Act, 5 U.S.C. § 706(1), (2)(A). *Id.* at 14. *See also* 5 U.S.C. § 706(2)(C). Thus, the following counts remain at issue:

> **Count I**, alleging that the actions and inactions of the Forest Service in each of the Wilderness Study Areas "have resulted in substantially increased motorized use of WSAs, which has resulted in increased environmental damage, disruption of wildlife and despoiling of aesthetic values," all in derogation of the Wilderness Study Areas' potential for wilderness designation and Congress' management mandate. Complt. at 7, ¶ 12.

> **Count III**, alleging that the Forest Service's improvement of erosion bars and placement of new bridges and plastic culvert pipes has so improved trails in the Hyalite–Porcupine–Buffalo Horn Wilderness Study Area in the Gallatin National Forest as to encourage motorized use and diminish the study area's wilderness characteristics and suitability for wilderness designation.

> **Count VI**, alleging that the Forest Service dynamited boulders, placed crushed gravel, and constructed new trails in the West Pioneers Wilderness Study Area in the Beaverhead National Forest, thus encouraging increased motorized use and compromising the wilderness quality of the area.

> **Count IX**, alleging that the Forest Service violated its duty to assess the cumulative impacts of increased motorized use of Wilderness Study Areas when it categorically excluded trail improvement projects from review under the National Environmental Policy Act.

All parties moved for summary judgment, and oral argument was heard. For the reasons set forth below, summary judgment is granted in favor of Plaintiffs on Counts I, III, and VI. Count IX will be dismissed without prejudice.

## II. The Montana Wilderness Study Act

The roots of the Montana Wilderness Study Act reach back to 1967, when the United States Forest Service undertook an inventory of certain roadless and undeveloped areas in national forests. S.Rep. No. 95–163 (1977), at 2. The "Roadless Area Review and Evaluation," known as RARE, was completed in 1972. Nine seemingly wild areas in Montana were rejected for further wilderness study because they were arbitrarily divided into smaller units and were then found to be too small to sustain an appropriate level of "solitude," or because they contained some commercial timber, or because the Forest Service sought more "purity" than the areas could provide.[1] H.R.Rep. No. 95–620 (1977), at 2.

In 1976, the Senate Committee on Energy and Natural Resources brought to the floor S. 393, a bill authored by Senator Lee Metcalf. S. 393 would have identified these nine areas as "wilderness study areas" to be considered for designation as Wilderness Areas under the Wilderness Act of 1964. The bill passed the Senate by a voice vote on August 23, 1976,[2] but died when the 94th Congress adjourned.

In the 95th Congress, Senator Metcalf reintroduced the bill, explaining that:

[d]uring the study period, and until Congress determines otherwise, *these areas are to be managed* by the Secretary *so as not to diminish their presently existing wilderness character and potential.* This language regarding wilderness character and potential was added by the committee last Congress (and retained in this year's version) to assure *continued enjoyment* of the areas *by those recreationists whose pursuits will not,* in the judgment of the Secretary, *preclude potential wilderness designation for the areas.*

S.Rep. No. 95–163, at 2 (emphasis added).

The House of Representatives was also involved in trying to resolve the question of how the land should be designated and what its use should be. Recognizing one of two concerns aired in committee hearings, the House Report considered and accepted continuing use of off-road vehicles in the nine areas that now are the subject of this lawsuit:

The *use of off-road vehicles,* while generally prohibited in designated wilderness areas, *is entirely appropriate in wilderness study areas .... Nothing* in S. 393 *will prohibit the use of off-road vehicles, unless the normal Forest Service planning process ... determines off-road vehicle use to be inappropriate* in a given area.... [I]t is the intention of the committee that the areas in S. 393 remain open to off-road vehicle use unless and until they are formally designated as wilderness.

H.R.Rep. No. 95–620 (1977), at 4 (emphasis added).[3]

---

1. *Cf. Parker v. United States,* 309 F.Supp. 593 (D.Colo.1970) (enjoining proposed timber sale in area bordering primitive area on grounds that border area contained most characteristics of primitive area, notwithstanding presence of "substantially unnoticeable" access road).

2. S.Rep. No. 95–163, at 2, says the bill passed on August 23, 1977. However, the Senate Report is dated May 14, 1977. Presumably the date of the previous bill's passage is inaccurate.

3. The House Report is frequently quoted in Forest Service documents in the Administra-

The clarity of Congress' endorsement of continuing off-road vehicle use is qualified by the fact that Congress also intended to reach a final decision about such use within a short time, when it was to decide whether to designate any of the nine areas as Wilderness Areas. The House Committee on Interior and Insular Affairs, wary of "tying up this large acreage in wilderness study status for longer than is necessary," H.R.Rep. No. 95–620 (1977), at 1, recommended that the Forest Service "give a high priority to the completion of all nine studies within a period of 24 to 30 months (or less), if at all possible," and that the President "make his recommendations to Congress ... [in] no more than 6 months," *id.* at 2. The "legislative force" of the Act was directed at a more modest pace. It allowed 5 years for study and 2 years for executive review and recommendations. *Id.* Thus, Congress anticipated that each area designated as a wilderness study area would either be designated Wilderness or would be removed from the protective cover of the study by about 1984.

Today, 24 years after the enactment of S. 393, the nine areas it set aside remain "Wilderness Study Areas."[4] The Forest Service remains charged with managing the areas "so as to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System," Pub.L. No. 95–150, § 3(a), 91 Stat. 1243 (1977). The controversy at hand questions what it means to "maintain" these areas-in-limbo. Did Congress intend to keep the land and its use as it was in 1977? Or did Congress intend to preserve the potential of the land without major concern for its use while it was studied?

tive Record. Although references may exist, the Court did not note any reference to Senator Metcalf's Report, quoted above, which stated the areas should be managed *"so as not to diminish* their presently existing wilderness character and potential" (emphasis added).

## III. Analysis

### A. Count I

The Montana Wilderness Study Act provides:

> Except as otherwise provided by this section ... the wilderness study areas designated by this Act shall, *until Congress determines otherwise, be administered* by the Secretary of Agriculture so as *to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System.*

Pub.L. No. 95–150, § 3(a), 91 Stat. 1243 (1977) (emphasis added).

Congress has not used the identical phrases contained in this statute in any other bill. The parties agree that motorized use is not consistent with wilderness character, *see* 16 U.S.C. §§ 1131(c), 1133(c), but further agree that Congress intended to allow some motorized use to continue.

Relying on language in the Federal Land Policy and Management Act, Plaintiffs argue that the Act established a "non-impairment" standard and directed the Forest Service to maintain the status quo of 1977, restricting the types of vehicles and levels of use that could be accommodated. The Forest Service and the Intervenors argue that Congress only directed maintenance of the areas' potential for designation as Wilderness: *"If* Congress acts to designate these areas as Wilderness, they *will have* the same potential for solitude and primitive recreation as they did in 1977." Def. Br. at 8 (emphasis added).

**4.** The Senate report's finding that "[l]ittle, if any, additional paperwork would result from the enactment of S. 393," S.Rep. No. 95–163 (1977), at 17, was perhaps prophetic.

*1. Defendants' Interpretation and Chevron Deference*

■ Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *Haynes v. United States*, 891 F.2d 235, 238 (9th Cir.1989), *cited in* Forest Service Br. at 1–2, an implementing agency's interpretation of a statutory scheme is entitled to deference if Congress has not spoken directly to the question raised and if the agency's interpretation of the statutory language is reasonable. *Chevron* deference is not due if the agency's interpretation is contrary to the statute. *See Echazabal v. Chevron U.S.A., Inc.*, 226 F.3d 1063, 1069 (9th Cir.2000).

■ Congress has spoken directly to the issue presented here, i.e., the management objectives of the Forest Service. Congress required the agency to manage the Wilderness Study Areas "so as to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System."

The language of the statute commands the United States Forest Service to do two things. It requires the Forest Service to "maintain [the areas'] presently existing wilderness character," and it requires the Forest Service to "[maintain their] potential for inclusion in the National Wilderness Preservation System." If the areas' wilderness character is maintained, then undoubtedly their potential for designation is maintained. But maintaining the land's potential for designation as Wilderness does not necessarily ensure the maintenance of their 1977 "presently existing" wilderness character.

The Forest Service argues that it need not do the first if it can pledge the second. Under that reasoning, temporary trails might be laid down in every segment of every Wilderness Study Area, regardless of whether the trails were there in 1977, so long as the traces of those trails could be removed within a reasonable time after Congress selected the area for designation as Wilderness. The Forest Service and the Intervenors do not argue that motorized use has not increased, nor do they argue that this increased use has had no effect on the Wilderness Study Areas. Rather, they argue that whatever motorized use is now allowed does not compromise the areas' potential for designation as Wilderness Areas.

■ But that is not a reasonable interpretation of what Congress demanded. To accept the Forest Service's argument, one must ignore the first phrase of Congress' imperative, so that the statute says that the Wilderness Study Areas must be administered "so as to maintain their [. . .] potential for inclusion in the National Wilderness Preservation System." Under the Defendants' and Intervenors' reading, the phrase "presently existing wilderness character" is surplusage, because it could mean only that the areas have potential to be included in the National Wilderness Preservation System. To ignore part of what Congress said in a statute is not reasonable, even under a deferential reading.[5]

---

**5.** Moreover, Congress did not require that the Wilderness Study Areas be managed in accordance with standards existing prior to the Act, although the Wilderness Act itself did so. Such standards would have come from the Multiple Use Act, 16 U.S.C. § 528 ff. *Compare* 16 U.S.C. § 1132(b) (requiring Forest Service to manage areas designated "primitive" as of September 3, 1964, to be managed "under the rules and regulations affecting such areas on September 3, 1964 until Congress has determined otherwise"). Nor did the advent of RARE II, the Forest Service's second round of inventories of roadless areas and evaluations for Wilderness designation, vitiate Congress' intent to set aside these Montana areas under its own peculiar standard. Thus, for the Forest Service to manage the areas under criteria more appropriate to

Construing the first statutory phrase not as surplusage but as meaningful, no interpretation can make "presently existing wilderness character" mean anything other than the wilderness character existing at the time Congress issued its mandate. In 1977, it was impossible to say "presently existing" and mean "existing in 1996 or 2001." In 1977, Congress required preservation of the status quo as regards the study areas' wilderness character.

### 2. Plaintiffs' Interpretation

On the other hand, Plaintiffs' reading of the statute is not entirely correct either. They employ the same "gap" theory of statutory interpretation used by the Defendants and Intervenors: where the language does not support your interpretation, leave gaps. The Wilderness Association's interpretation of the statutory language renders the second phrase surplusage. In Plaintiffs' view, the statute would say that the Wilderness Study Areas must be administered "so as to maintain their presently existing wilderness character [pending a decision as to their] inclusion in the National Wilderness Preservation System." As stated above, maintaining each Wilderness Study Area exactly as it existed in 1977 would necessarily mean that the areas' "potential for inclusion in the National Wilderness Preservation System" was also maintained. Therefore, there would be no need for Congress to include the latter phrase.

### 3. Legislative History and Context

The meaning of the apparently incongruous statutory terms can be fleshed out

by recourse to legislative history, as all parties have suggested. That history indicates Congress' awareness when enacting the questioned statute that the Wilderness Study Areas included some areas where motorized use was allowed and some areas where it was not allowed. The wilderness character of the study areas may not have been perfect or complete; otherwise, they might have been designated Wilderness Areas instead of study areas. But the wilderness character of the land areas was not absent either. To the extent the wilderness character was there, Congress wanted to maintain it.[6] To the extent the wilderness character was lacking, Congress did not want to impose it.[7] One Wilderness Study Area could contain areas that had wilderness character to be kept intact while other parts were beyond the Wilderness pale.

Even so, Congress did not require a "freeze" of all activity. It contemplated that use levels might fluctuate and that types of motorized vehicles might change. Congress intended that existing and new or different uses should be accommodated, so long as they did not undermine an area's potential for Wilderness designation *and* so long as they did not undermine the area's presently existing wilderness character.

### 4. The Meaning of the Montana Wilderness Study Act of 1977

In short, the statute requires the Forest Service to strike—and maintain—a balance between wilderness character and motorized use.[8] Because Congress did not

---

the Multiple Use Act or RARE II is to ignore a Congressional mandate.

**6.** Senator Metcalf stated the areas were to be managed *"so as not to diminish"* their presently existing wilderness character and potential." S.Rep. No. 95–163, at 2 (emphasis added).

**7.** "Nothing in S. 393 will prohibit the use of off-road vehicles." H.R.Rep. No. 95–620 (1977), at 4.

**8.** In 1996, District Ranger Larry Timchak of the Judith Ranger District noted "While motorized users typically have a high tolerance for non-motorized recreationists, the reverse is typically not the case." A.R. Vol. 5, Bk. 1,

require a "freeze," it did not require that only those segments of the Wilderness Study Areas already open to motorized activity should remain so, or that those segments already closed should remain so. Indeed, that plan could result in "freezing out" motorized use altogether or, on the other hand, in precluding Wilderness designation, due to degradation of the wilderness character (for example, by excessive use impacts) over time. Instead, Congress required that the Forest Service ensure continuing opportunities for enjoyment of the study areas by use of motorized vehicles, as well as continuing opportunities for enjoyment of the study areas' character *qua* wilderness.

Consequently, in making decisions about trail maintenance, improvement, construction, motorized use, and closings, the Forest Service must consider the impact of its decisions on the nature, quality, and scope of the particular study area's wilderness character as it existed in 1977. Conversely, in making decisions about trail closings, the Forest Service must consider the impact of its decisions on the nature, quality, and scope of motorized use as it existed in 1977, provided that it also considers what is necessary to avoid precluding Wilderness designation by changing the character of the land through new, different, or expanded diverse uses.

*5. Merits of Count I*

A search of the 47–volume Administrative Record in this case shows that the Forest Service did not base its management of these areas on a coherent description of either the "presently existing wilderness character" in 1977 or the opportunities for motorized use in 1977. On occasion, the agency considered the impact of management decisions in motorized segments of the study areas on the wilderness character of non-motorized segments as of 1977. *See, e.g.,* A.R. Vol. 5, Bk. 1, Sec. 12, Doc. No. 32, Decision Notice and Finding of No Significant Impact, Middle Fork Judith Road and Trailhead Improvement, at DN–4 ("Development of new routes could occur in the Area Closure G area which could detract from its existing wilderness character.... The 1977 Montana Wilderness Study Act as well as the legislative history point out that wilderness study areas need not be managed as wilderness, except as to maintain their presently existing wilderness character.").

■ However, sporadic consideration of the Congressional mandate is not sufficient. Nor is consideration possible without a meaningful standard. *See, e.g., Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1379 (9th Cir.1998) ("To 'consider' cumulative effects, some quantified or detailed information is required.").

Furthermore, the Forest Service has not proffered any reason for its failure to consider the impact of its management decisions on the wilderness character or motorized uses of the areas in 1977. The management rationale is reflected in the notion that anticipated designation is the greater part of management.

Congress does not ask agencies to do the impractical. *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 764 (9th Cir.1996). But an assessment of the Montana study areas' wilderness character and the associated motorized uses in 1977 is not, and was not, impractical. The Forest Service developed the Wilderness Attribute Rating

Sec. 12, Doc. No. 32, Decision Notice and Finding of No Significant Impact, Middle Fork Judith Road and Trailhead Improvement, at DN–4. No doubt Ranger Timchak's observation was as true in 1977 as it was in 1996 and is today.

System to identify and evaluate wilderness character. One of these attributes—solitude—appears most likely to be impacted by management decisions in motorized use areas, not necessarily because well-maintained trails might lead to more traffic, but because the aural traces of motorized use are difficult, if not impossible, to manage and control. The Rating System was introduced in 1967, with the Roadless Area Review and Evaluation. While it might in some instances be too generalized to be useful, *see, e.g., California v. Block,* 690 F.2d 753, 763–64 (9th Cir.1982), it does provide a benchmark for prospective management and specific criteria to guide and exemplify the agency's exercise of its discretion. The Forest Service has also completed studies regarding each Wilderness Study Area's suitability for Wilderness designation.

Because the Forest Service has interpreted the Act to require only that the areas' potential for wilderness designation be maintained, it has failed to consider whether, how, and to what extent its management decisions have impacted the wilderness character of the areas as they existed in 1977, as the statute requires. I conclude that the Forest Service has "unlawfully withheld or unreasonably delayed" its maintenance of the Montana Wilderness Study Areas' 1977 wilderness character. 5 U.S.C. § 706(1); Complt. at 7, ¶ 12. Plaintiffs are entitled to summary judgment on Count I.

## B. Counts III and VI

■ Plaintiffs are also entitled to summary judgment on Counts III and VI. The Forest Service has not considered whether, how, and to what extent its management decisions in the Hyalite–Porcupine–Buffalo Horn Wilderness Study Area in the Gallatin National Forest and in the West Pioneer Wilderness Study Area in the Beaverhead National Forest have impacted the nature, quality, and scope of the

wilderness character of those areas as they existed in 1977. Thus, the agency has unlawfully withheld or unreasonably delayed its maintenance of the areas' 1977 wilderness character.

To the extent Counts III and VI pertain to final agency actions already taken, the Forest Service abused its discretion and acted arbitrarily and capriciously, 5 U.S.C. § 706(2)(A), and acted "short of statutory right," *id.* § 706(2)(C), in failing to develop discernible criteria for assessing and maintaining the wilderness character of non-motorized use areas while conducting trail maintenance and improvement in areas of motorized use.

## C. Count IX

■ Under the National Environmental Policy Act, an environmental impact statement must be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Because the Forest Service made its decisions regarding categorical exclusions under the wrong statutory standard, the Court has no way of determining whether its application of categorical exclusions violated NEPA or not. To allow the agency to reconsider under the appropriate standard, Count IX is dismissed without prejudice.

## D. Remedy

■ In this case, Plaintiffs requested declaratory and injunctive relief. *See* Complt. at 14–15, ¶¶ 1–6. Ordinarily, the remedy in a lawsuit involving an administrative agency's actions is remand to the agency. This approach acknowledges the agency's unique expertise and its responsibility to execute the law by allowing the agency to reformulate its objectives and exercise its discretion in planning to fulfill them.

The appropriate remedy is to allow the Forest Service to consider its management of the Montana Wilderness Study Areas in light of the correct statutory standard. Plaintiffs are entitled to declaratory judgment and to injunctions requiring the Forest Service to comply with the statute and to take reasonable steps to restore the wilderness character of each Montana Wilderness Study Area if its wilderness character has been diminished since 1977.

## IV. Conclusion

In 1977, Congress intended to decide[9] the fate of 973,000 acres of Montana land by 1984, at the latest. To make an informed decision, it set the land aside for study. To keep its options open and to continue to allow the areas to provide the kinds of experiences that people drew from them in 1977, Congress ordered the Forest Service to "maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System."

Had Congress acted when it intended to, the Forest Service would not face its decades-long management dilemma. Nonetheless, the statutory imperative is not diminished by time. Congress may choose not to act on these areas for some time to come. That question is a matter solely for Congress. Whether Congress acts tomorrow or years from now or never, the 1977 Montana Wilderness Act requires that the nature, quality, and scope of experiences supported by the Wilderness Study Areas shall be maintained, awaiting Congress' decision.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment (dkt # 68) is GRANTED as to Counts I, III, and VI of the Complaint. Count IX of the Complaint is DISMISSED without prejudice.

IT IS FURTHER ORDERED that the Clerk of Court shall enter Judgment by separate document. The Judgment shall state that the Forest Service violated Pub.L. No. 95–150, § 3(a), 91 Stat. 1243 (1977), by failing to administer the Montana Wilderness Study Areas so as to maintain each area's wilderness character as it existed in 1977.

IT IS FURTHER ORDERED that the United States Forest Service is ENJOINED from taking any action in any Montana Wilderness Study Area that diminishes the wilderness character of the area as it existed in 1977 or that diminishes the area's potential for inclusion in the National Wilderness Preservation System.

IT IS FURTHER ORDERED that the United States Forest Service is ENJOINED to take reasonable steps to restore the wilderness character of any Montana Wilderness Study Area as it existed in 1977 if the area's wilderness character or its potential for inclusion in the National Wilderness Preservation System has been diminished since 1977.

IT IS FURTHER ORDERED that Plaintiffs are entitled to their costs and attorneys' fees under the Equal Access to Justice Act. Plaintiffs shall serve and file an application on or before June 22, 2001. Defendants and Intervenors may respond to the application on or before July 13, 2001.

---

9. *See* Ambrose Bierce, *The Devil's Dictionary* 29 (Dover ed.1952) (1881–1906) (defining "decide" as "[t]o succumb to the preponderance of one set of influences over another set.").