Mario ECHAZABAL, Plaintiff–
Appellant,

v.

CHEVRON USA, INC.; Irwin
Industries, Inc., Defendant–
Appellee.

No. 98–55551.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 19, 2002.

Filed July 23, 2003.

Larry Minsky, Cerritos, CA, for the plaintiff-appellant.

Jon Kardassakis, Hawkins, Schnabel, Lindahl & Beck, Los Angeles, CA, for defendant-appellee Chevron USA Inc.

Dori K. Bernstein, Washington, DC, for amicus curiae United States Equal Employment Opportunity Commission, urging reversal.

Craig E. Stewart, Pillsbury Winthrop, San Francisco, CA, for amici curiae American College of Occupational and Environmental Medicine, Western Occupational and Environmental Medical Association, and California Society of Industrial Medicine and Surgery, urging affirmance.

Before REINHARDT, TROTT, and TASHIMA,* Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge TROTT.

## OPINION

TASHIMA, Circuit Judge:

In this action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), we held in an earlier opinion that the "direct threat" defense provided by 42 U.S.C. § 12113 in an ADA discrimination action does not include threats to the employee's own health.

---

* Judge Tashima was randomly selected to replace Judge Bright, who was a member of the original three-judge panel, after Judge Bright recused himself subsequent to the issuance of the Supreme Court's mandate.

*Echazabal v. Chevron U.S.A., Inc.*, 226 F.3d 1063, 1070 (9th Cir.2000). In *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) ("*Echazabal*"), the Supreme Court reversed and remanded, holding that the direct threat defense includes threats to an employee's own health. It also held the EEOC's direct threat regulation, 29 C.F.R. § 1630.15(b)(2) (defining the defense to include threats to the employee), to be valid. *Id.*

In light of *Echazabal*, the only remaining issue on remand is whether Chevron has met the requirements for assertion of the direct threat defense. Specifically, we must decide whether Chevron based its decision upon " 'a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Echazabal*, 122 S.Ct. at 2053 (quoting 29 C.F.R. § 1630.2(r) (2001)). We conclude that, on summary judgment, material issues of fact remain; therefore, the district court erred in granting summary judgment to Chevron. We reverse and remand for further proceedings.

## FACTUAL BACKGROUND

Between 1972 and 1996, Mario Echazabal worked for a variety of maintenance contractors at Chevron's oil refinery in El Segundo, California, primarily within the coker unit. In 1992, Echazabal applied to work directly for Chevron in the same coker unit. Chevron extended to him an offer of employment, contingent on his passing a physical examination. An examination by Chevron's physician revealed that Echazabal's liver was releasing higher than normal levels of enzymes. Chevron concluded that Echazabal's health might be at risk from exposure to chemicals present in the coker unit and rescinded its offer. Echazabal continued to work at the refinery as an employee of Irwin Industries, Inc., a maintenance contractor for Chevron.

After learning of these test results, Echazabal consulted with his own doctors and was eventually diagnosed with asymptomatic, chronic active hepatitis C. Throughout his treatment, Echazabal informed his personal physicians about the work he continued to perform at the refinery. None of the physicians advised him to cease working there.

In 1995, Chevron again offered Echazabal a job, contingent on passing a physical examination. Echazabal had the physical examination Chevron requested in January 1996. Shortly thereafter, he received a letter, dated February 6, 1996, informing him that Chevron was withdrawing the job offer based on its determination that Echazabal's liver would be damaged and his health at risk if he worked at the coker unit. Prior to the receipt of this letter, Echazabal had not received any indication that the offer might be withdrawn, nor had he been given any opportunity to demonstrate that he could safely perform the job.[1] Unlike the previous time that Chev-

---

1. Given the short period of time between Echazabal's physical and Chevron's withdrawal of its job offer, it is not surprising that Echazabal was unable to marshal expert medical opinion that he could work safely in the coker unit. The dissent's criticism that Echazabal failed promptly to demonstrate his fitness for the position ignores both this short time frame and the manner in which Chevron's decision was communicated to him.

 Given this short time frame, it also appears unlikely that Chevron considered whether any

ron withdrew its job offer, this time Chevron also asked Irwin to remove Echazabal from the refinery or place him in a position that would eliminate his exposure to solvents or chemicals. As a result, Echazabal lost his position with Irwin at the El Segundo refinery, which also caused him to lose his medical insurance coverage. Consequently, he was no longer able to pay for medical services and was unable to continue with the medical group he had been seeing for his liver condition.

## ANALYSIS

■ An employer can defend against a disability discrimination claim under the ADA by relying on a qualification standard that "is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Such a qualification standard "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). The statute further provides that "[t]he term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Because it is an affirmative defense, the burden of establishing a direct threat lies with the employer. *Hutton v. Elf Atochem N. Am. Inc.*, 273 F.3d 884, 893 (9th Cir.2001); *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999).

Before excluding an individual from employment as a direct threat, an employer must demonstrate that it has made an "individualized assessment" of the employee's ability to perform the essential functions of the job, "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). The factors to be considered include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm."[2] *Id.* The Supreme Court emphasized the requirement of a "particularized enquiry into the harms the employee would probably face." *Echazabal*, 122 S.Ct. at 2053.

## A. The "individualized assessment" requirement

Chevron defends its assessment disqualifying Echazabal from employment with three arguments: (1) It satisfied the individualized assessment requirement by relying on the "facially proper" opinions of "competent physicians." (2) There were no genuine issues of material fact with regard to the four *Arline* factors. (3) The opinions of Echazabal's medical experts cannot be considered in evaluating its employment decision because they were made "long after the fact."

measures could be taken to minimize the perceived risk to Echazabal. Dr. McGill, the Chevron doctor who considered Echazabal's case in 1996, testified that he did not contact the Industrial Hygiene Department to determine whether protective measures could prevent injury to Echazabal. Because, however, the district court did not develop the record on whether Chevron attempted to accommodate Echazabal's condition prior to withdrawing its offer and, if so, what steps were taken, as we conclude in Part B, *infra*, we cannot

address the reasonable accommodation issue on this record. Because the record has not been developed, the dissent's conclusion that accommodation would cause Chevron undue hardship "as a matter of law" is groundless speculation.

**2.** These factors were first articulated by the Supreme Court in *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), and are commonly referred to as the *"Arline* factors."

### 1. The standard for evaluating medical judgments

■ Chevron argues that its reliance on the advice of its own doctors, and allegedly upon that of Echazabal's doctors, constitutes a "facially reasonable" and thus a legally sufficient "individualized assessment" of Echazabal. This is an erroneous interpretation of the governing standard.[3] The regulation presents a much more specific matrix against which to measure the reasonableness of the employer's action:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

In *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court considered a direct threat defense presented by a dentist concerned about treating an HIV-infected patient. The Court stated that the health care provider had a duty to assess the risk based on "the objective, scientific information available to him and others in his profession." *Id.* at 649, 118 S.Ct. 2196. A subjective belief in the existence of a risk, even one made in good faith, will not shield the decisionmaker from liability. *Id.* This Circuit has held that an employer must gather "substantial information" about an employee's work history and medical status. *Nunes*, 164 F.3d at 1248. The decision must be based upon "particularized facts using the best available objective evidence as required by the regulations." *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1309 (11th Cir.2001); *cf. McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir.1999) (holding that policies requiring employees to be "100% healed" before returning to work violate the ADA because they preclude individualized assessment of whether employee can perform the essential functions of the job with or without accommodation).

■ Echazabal has raised a material issue of fact as to whether Chevron's decision was "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. § 1630.2(r). As part of the physical examinations ordered by Chevron, Dr. Baily, and later Dr. McGill, administered and relied upon tests that measure the levels of three enzymes in the bloodstream. Based on results demonstrating abnormally high levels of certain enzymes, Drs. Baily and

---

**3.** Chevron's argument that it did not rely upon stereotypes in assessing Echazabal's condition is besides the point. While the ADA was passed, in part, to counter stereotypical assumptions about the disabled that result in discrimination, 42 U.S.C. § 12101(a)(7), the mere fact that an employer avoids stereotypes does not satisfy its affirmative obligation to make an assessment based on "the most current medical knowledge and/or on the best available objective evidence."

McGill concluded that Echazabal's liver was not functioning properly, and recommended that Echazabal not be exposed to chemicals that could be toxic to his liver.[4] Neither Dr. Baily nor Dr. McGill has any special training in liver disease. Baily's area of medical expertise is in preventive medicine, while McGill is a generalist, with no board certification in any specialty. In contrast, Echazabal's experts, Dr. Fedoruk and Dr. Gitnick, are specialists in toxicology and liver disease.[5] Their opinions demonstrate that enzyme tests do not produce information regarding liver function. Rather, enzyme tests reflect only that an infection is ongoing. According to Fedoruk and Gitnick, the only tests that do measure liver function—blood albumin levels and prothrombin time—revealed that Echazabal's liver was functioning properly. Far from showing "cutting edge research," as Chevron argues, these opinions offered the unequivocal assessment that Echazabal could work at the refinery without facing a substantial risk of harm, beyond that faced by other workers. The required assessment could not be based upon "common sense," as Chevron argues, but rather only after—at a minimum—a consultation with a medical professional who had made an "objective, scientific" judgment. *Bragdon,* 524 U.S. at 629, 118 S.Ct. 2196.

Echazabal presents evidence that there was no scientific basis for the contrary opinions of Chevron's doctors. Both Dr. Gitnick and Dr. Fedoruk stated that "there

is no medical or scientific evidence" supporting a finding that Echazabal's chemical exposures from working as a plant helper or in the coker unit would present an appreciable or clinically significant risk. Dr. Fedoruk indicated that for some of the chemicals identified as potentially risky for Echazabal, an individual would receive a higher dosage from a daily multivitamin tablet than Echazabal would receive from working in the refinery. Based on the opinions of Drs. Fedoruk and Gitnick, a reasonable jury could conclude that Chevron failed to rely upon a "reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."

In addition, the record does not support the district court's conclusion that the medical opinion letters from Echazabal's doctors evaluating his specific position all concurred that the job posed a "serious, immediate risk to him." On April 5, 1993, Dr. Ha wrote: "In my opinion the patient is now capable of carrying on with the work that he has applied for and there is no restriction on his activity at work as outlined by the working condition sheet GO 308 that was sent to me."[6] Dr. Ha stated that Echazabal's prognosis "should be very good." Dr. Ha's opinion, based on her knowledge of Echazabal's potential work environment, does not support the view that she concurred in Chevron's assessment.[7] On November 10, 1993, and

---

4. Dr. McGill replaced Dr. Baily in July 1993. Baily conferred with McGill about Echazabal's condition, and McGill concurred with Baily's conclusions.

5. Dr. Fedoruk is a board-certified physician in Occupational Medicine, Industrial Hygiene, and Toxicology. Dr. Gitnick is Chief of the Division of Digestive Diseases of the UCLA School of Medicine and a leading authority on liver disease.

6. The GO–308 is Chevron's job summary for the coke handler and coke plant helper positions. It identifies airborne contaminants and chemicals in the work environment, including "hydrocarbon liquids and vapors, acid, caustic, refinery waste water and sludge, petroleum solvents, oils, greases [and] chlorine bleach."

7. The district court incorrectly states that this letter did not relate to the 1995 job offer and that there was no record evidence that the letter was seen by Chevron's doctors or Ir-

July 20, 1994, Dr. Suchov wrote two letters indicating that there was "no limitation" on Echazabal's ability to work and that he could return to his "usual duties." Although the district court dismissed these letters because they did not address Echazabal's specific job duties, Echazabal's declaration states that he informed all of his doctors of the type of work that he performed. These letters, together with Echazabal's own declaration, raise a material issue of fact as to the objective reasonableness of Chevron's opinion.

The dissent describes as "clincher" the communications between Dr. McGill and Dr. Weingarten, one of Echazabal's treating physicians, in which Dr. Weingarten recommended against exposure to hepatotoxic hydrocarbons. The sum total of the recommendation was as follows:

> In your letter, it is mentioned that Mr. Echazabal has applied for return of his job and it mentioned that "this may entail exposure to hepatotoxic hydrocarbons." This, of course, is recommended not to be the case.

This general statement, which followed a statement that Echazabal was in good health and showed no sign of liver failure, is insufficient to carry Chevron's burden of establishing that it relied on the "most current medical knowledge and/or the best available objective evidence" and that it considered the likelihood of harm, its possible severity, and imminence. Notably missing from this statement is any indication that Dr. Weingarten was asked to consider the specific chemical exposures, to indicate the levels at which they would become dangerous or the likelihood that they would injure Echazabal, or even

whether the risk to Echazabal was any greater than that for a healthy individual. (Indeed, it is difficult to imagine that any responsible doctor would recommend exposure of even his healthiest patient to an unspecified amount of hepatotoxic chemicals.) The district court notably found that "Dr. Weingarten was not informed by Dr. McGill about the specific chemicals to which plaintiff would be exposed, or the levels of concentration of those chemicals."

▪ Chevron was required to do more than consider generalized statements of potential harm. Before refusing to hire Echazabal, Chevron was required, under the terms of 29 C.F.R. § 1630.2(r), to consider the severity, imminence, and potential likelihood of harm. Based on consideration of these factors, Chevron had the burden of demonstrating at least a "significant risk of substantial harm" to Echazabal. *Id.* The EEOC's Interpretive Guidance for this section explains that where the employer invoking the direct threat defense relies on threats to the employee, the employer must determine that there is a "high probability of substantial harm" to the individual. 29 C.F.R. pt. 1630 App. (EEOC Interpretive Guidance on Title I of the ADA) (*"Interpretive Guidance"*). Echazabal has raised a material question of fact as to whether Chevron made an adequate analysis. Dr. Weingarten's general statement, unrelated to the demands and conditions of the particular position or the likelihood, imminence, or potential severity of harm (or even whether Echazabal was at greater risk than a healthy individual), would not preclude a reasonable juror from concluding that Chevron failed to make the required assessment.

win's expert, Dr. Tang. The job that Echazabal applied for in 1995 was a "plant helper" position at the coker unit described in GO 308, which was reviewed by Dr. Ha. In addition, Dr. Tang specifically references Dr. Ha's

letter in his deposition when describing the contents of Echazabal's medical file. Dr. Ha's letter was directed to Chevron and was part of Echazabal's record.

## 2. Evaluation of the Arline factors

Had Chevron conducted the individualized assessment required by law, it would have considered in detail the four *Arline* factors as they applied to Echazabal's condition. Chevron argues that there are no genuine issues of material fact with regard to the four *Arline* factors to be considered in assessing whether Echazabal's condition posed a "direct threat." While Echazabal concedes that the first *Arline* factor—the duration of his condition—is not disputed, he has raised material issues of fact about the three remaining factors.

▆ First, Echazabal has raised a material issue of fact as to whether Chevron properly assessed the nature of the potential harm. The record indicates that the Chevron doctors were unfamiliar with the specific risks of Echazabal's position. Dr. Baily stated in his deposition that he did not know the types or concentrations of toxin, liquid, or vapor exposures Echazabal would face in the coker unit, that he made no attempt to ascertain this information and did not contact either the Industrial Hygiene Department or an outside specialist to determine whether Echazabal could perform the plant helper job. He indicated that solvents are only liver toxic "in sufficient quantities," but he made a blanket recommendation that all exposure be avoided. He made only a general recommendation that Echazabal not be exposed to hepatotoxins, unrelated to any specific position, assuming that it was management's responsibility to determine Echazabal's fitness for a particular job, and that he was not charged with considering specific exposure levels or chemicals. In fact, Dr. Baily anticipated that management would contact a specialist. He stated that the limitations "were not specifically based on any ... individual work place exposure. The limitations were placed in general fashion to give guidance to management so that they would then be able to work with the specialist in determining which jobs might be appropriate for that applicant or employee."

Similarly, Dr. McGill testified in his deposition that, at the time he assessed Echazabal, he did not know the levels of hydrocarbons to which a plant helper would be exposed, was not aware if any regulatory levels would be exceeded, and that he did not attempt to contact the Industrial Hygience Department to determine whether the industrial setting in the coker unit would be harmful to Echazabal.[8] Although he contacted Industrial Hygiene with regard to other employees, Dr. McGill did not do so in Echazabal's case because he assumed that it "had been thoroughly worked over in the 1992 phase [a]nd [he] was assuming that it had been investigated." [9]

---

8. Dr. McGill's declaration states that he reviewed the job description for the plant helper position, which provided information that the position involved exposure to various chemicals, fumes, etc., and the same GO–308 that Dr. Ha reviewed. Thus, at least by the time he made his declaration, Dr. McGill may have had a general knowledge that some exposure would occur in the position.

9. Thus, the dissent is incorrect in suggesting that the Chevron doctors based their determination on considerations of the specific risks of the position for which Echazabal applied. It states that Drs. Baily and McGill were "personally familiar with the conditions and demands of the work at issue," and that Dr. McGill "determined that the chemicals and solvents to which Mr. Echazabal would be exposed at the refinery would further damage his reduced liver capacity and seriously endanger his health and his life." In fact, neither doctor considered the risks of the specific position. As we have shown in the text above, Dr. Baily assumed that this would be done by management in conjunction with a specialist and Dr. McGill assumed that it had already been done.

Moreover, neither of the Chevron doctors had expertise in this area. Dr. Baily stated that he was not a liver specialist, that his experience with patients with chronic liver diseases was "very limited," that he was "not familiar with the specific biochemistry of liver abnormalaties," that he had not spoken with a liver specialist about Echazabal's case, and that he was not aware of specific evidence that hepatotoxins pose a risk to individuals with hepatitis. Dr. Baily had no knowledge of whether Chevron ever contacted a specialist about the position. Similarly, Dr. McGill had not treated any patients in the prior 15 years for chronic liver disease, did not consult any treatises on the issue, did not research the likelihood of liver failure due to exposure to liver toxins, and did not consult a specialist.

According to Dr. Fedoruk, who did review Chevron's records, the level of toxins present at the coker unit placed Echazabal at no greater risk of injury than other workers. He also stated that there was no reliable scientific or medical evidence to suggest that the other exposures would lead to hepatoxicity and most of the potential exposures identified by Chevron were insignificant. Dr. Gitnick opined that Echazabal was "at no greater risk of injuring himself and specifically his liver than any other employee." He stated that the contrary opinions of Chevron's doctors were simply wrong and unsupported by medical evidence.

Second, the declarations of Fedoruk and Gitnick suggest that, at the time of Chevron's evaluation, there was little indication that Echazabal faced potential harm that was (a) likely, or (b) imminent. For example, Dr. Gitnick stated that "I can say to a reasonable degree of medical certainty that Mr. Echazabal is in no greater risk of injuring himself and specifically his liver by working in the refinery than other employee [sic]. His liver is functioning properly and there is no evidence of liver failure." Dr. Fedoruk also indicated that his tests had remained stable over years of work at the refinery. These statements were not, as Chevron implies, merely differences of medical opinion. In several instances, Fedoruk and Gitnick declared that Chevron doctors were simply wrong in their assessment of Echazabal's condition and that their analysis is inconsistent with the literature on liver function. The Chevron doctors, unlike Fedoruk and Gitnick, were not experts in this field.

Finally, this Circuit has cautioned that individualized risk assessment also requires consideration of relevant information about an employee's past work history. See Nunes, 164 F.3d at 1248; Mantolete v. Bolger, 767 F.2d 1416, 1423 (9th Cir.1985) (holding that, in assessing elevated risk to an employee under the Rehabilitation Act, the employer must "gather [and assess] all relevant information regarding the applicant's work history and medical history"); see also Anderson v. Little League Baseball, Inc., 794 F.Supp. 342, 345 (D.Ariz.1992) (giving "great weight" to fact of disabled plaintiff's three years of service without incident in rejecting employer's direct threat defense). Chevron gave no weight to the fact that Echazabal had worked at the El Segundo refinery, without incident or injury, for over 20 years. A reasonable jury could find that this injury-free work history provided evidence that Echazabal would not pose a direct threat to himself as a coker unit employee.[10]

10. Chevron and the dissent emphasize the risk to Echazabal during an explosion or other emergency. There is no indication in the record, however, that Chevron considered the likelihood that this would occur and whether Echazabal was at any greater risk than other

### 3. Consideration of Echazabal's medical experts' opinions

 Chevron argues that the opinions offered by Echazabal's experts, Drs. Fedoruk and Gitnick, should not be considered because they were offered after the employment decision to exclude Echazabal from the refinery. Expert evidence of this nature, however, elucidates the very issue the court must assess—whether the opinion that a direct threat existed was *objectively* reasonable. *See Bragdon*, 524 U.S. at 649, 118 S.Ct. 2196; *Nunes*, 164 F.3d at 1248 (analysis of direct threat "requires the employer to gather 'substantial information' about the employee's work history and medical status, and disallows reliance on subjective evaluations by the employer"). The two expert opinions were directed in significant part to the state of medical knowledge—the best available objective evidence—at the time of Chevron's employment action. At the very least, they were highly relevant to that question. The subjective belief of Chevron's doctors is not relevant. *Id.*

Chevron also argues that to consult the Fedoruk and Gitnick opinions would be contrary to *Cook v. United States Dep't of Labor*, 688 F.2d 669 (9th Cir.1982). *Cook* addressed a claim under the Comprehensive Employment and Training Act of 1973, and preceded *Bragdon*, as well as the 1990 enactment of the ADA and the 1991 issuance of the EEOC regulation. *See* Equal Employment Opportunity for Individuals With Disabilities, 56 Fed.Reg. 35734 (1991) (codified at 29 C.F.R. pt. 1630) (issuing regulations pursuant to the ADA and noting that the ADA was signed into law on July 26, 1990). Moreover, *Cook* did not involve the application of a regulatory requirement that the employer's assessment be "based on a reasonable medical judgment that relies on the most current medical knowledge." Thus, because of these differing circumstances, *Cook* is unhelpful, much less controlling, in determining whether an employer has complied with the EEOC's ADA regulations requiring an individualized assessment based on the *Arline* factors and "the most current medical knowledge and/or the best available objective evidence." As the Supreme Court emphasized, the requirement of an individualized assessment in 29 C.F.R. § 1630.2(r) serves an important role in protecting against the risk of pater nalism the ADA was enacted to discourage. *See Echazabal*, 122 S.Ct. at 2052–53.

 Finally, we note that there is no medical evidence in the record to support Chevron's assertion that the opinions of Drs. Fedoruk and Gitnick were not "available" to Chevron when it made its assessment. Neither is there a showing that the body of medical knowledge on which those opinions were based was not available at the time, *i.e.*, was beyond the then "most current medical knowledge." Given this medical knowledge, there is an issue of material fact whether the medical judgments which formed the basis of Chevron's assessment were based on "the most current medical knowledge and/or the best available objective evidence," as required by the EEOC's regulation. 29 C.F.R. § 1630.2(r).[11]

---

employees. Moreover, the *Interpretive Guidance* indicates that "generalized fears about risks to individuals with disabilities in the event of an evacuation or other emergency [cannot] be used by an employer to disqualify an individual with a disability." 29 C.F.R. pt. 1630 App.

11. The dissent mistakenly overstates the importance of a treating physician's opinion, both factually and legally. As a factual matter, Dr. Weingarten made only a general comment about exposure to hepatotoxins. He simply did not provide a recommendation relating to the specific risks of the position. At

At the heart of Chevron's arguments lies an unfounded fear that a proper application of the "individualized assessment" standard requires employer awareness of cutting-edge medical research not generally known to or accepted within the medical community. This is not the case. Chevron asserts that by relying primarily upon the advice of a generalist and an expert in preventive medicine in order to come to a conclusion about Echazabal's *liver* problem, it met the statute's requirements. Before terminating an individual's livelihood, the ADA requires more.

The dissent contends that Chevron did enough. The dissent's quibble, however, is less with our opinion and more with the requirements of the ADA. The dissent makes little mention of the rigorous requirements of § 1630.2(r) and the employer's burden of proving that it complied with those requirements before it can rely on the direct threat defense. Rather, it

states vaguely that Chevron's decision was made "after appropriately and thoroughly considering all relevant factors," that "the process [was not] defective or unreasonable," that Chevron did not have to seek an outside expert in liver disease so long as its decision was "objectively reasonable under the circumstances," and it dismisses the Fedoruk and Gitnick opinions as irrelevant "to the bona fides and quality of Chevron's decision." None of these statements, however, expresses the governing standard for reviewing Chevron's decision.

Were we reviewing an administrative agency's decision under the substantial evidence standard of review and limited to the administrative record made before the agency, we might agree that the decision was not an abuse of discretion. That, however, is not our task on this appeal. Rather, without weighing the evidence at this summary judgment stage, we must

a minimum, his opinion should not be granted more weight than Dr. Ha's earlier opinion that Echazabal had no work restrictions. As a legal matter, the dissent relies on cases from an unrelated context—the review of Social Security disability benefit determinations. Judicial review of such administrative decisions is governed by the substantial evidence rule. *Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir.1999). We grant substantial deference to the agency because "[i]f the evidence can reasonably support either affirming or reversing the [agency's] conclusion, the court may not substitute its judgment for that of the [agency]." *Reddick v. Chater,* 157 F.3d 715, 720–21 (9th Cir.1998). In contrast, in an action to enforce the ADA, the employer's determination of unemployability is not entitled to any deference. Further, the judicial proceeding is not limited to the review of an "administrative" record, but the district court conducts plenary trial proceedings, as appropriate. While a treating physician's opinion may be particularly relevant to the agency's task of determining the extent of a disability in the Social Security context, there is no comparable requirement, as there is under § 1630.2(r), to consider the "most current medical knowledge and/or the best available

objective evidence." *Cf. Black & Decker Disability Plan v. Nord,* —— U.S. ——, 123 S.Ct. 1965, 155 L.Ed.2d 1034, 2003 WL 21210418 (U.S.2003) (rejecting the importation of the treating physician rule from the Social Security context to cases brought pursuant to ERISA, 29 U.S.C. § 1001 *et seq.*). Drs. Fedoruk and Gitnick opined that Chevron did not consider the correct tests of liver function and did not properly assess the level of risk in light of the most current medical knowledge. Their knowledge and assessment of the state of medical knowledge would not have been improved by treating Echazabal. The *Interpretive Guidance* does not place special emphasis on treating physicians, but rather indicates that their opinions, as well as those of experts on the disability in question, are relevant. 29 C.F.R. pt. 1630 App. ("Relevant evidence may include ... the opinions of medical doctors ... who have expertise in the disability involved and/or direct knowledge of the individual with the disability."). The weight to be given the treating physician's view will depend on all of the circumstances of the patient's case, including the nature and extent of the care and the degree of knowledge the physician may have as to the physical dangers the particular work environment presents.

decide only whether Echazabal has raised a material question of fact as to whether Chevron has met its burden under § 1630.2(r).[12] *See Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 2003 WL 21137731, at *18 (9th Cir.2003) ("it is not our role, at this stage, to take sides in this way"). He has succeeded in doing so.

### B. Accommodation and the Interactive Process

Finally, Echazabal contends that Chevron failed adequately to address its duty to accommodate Echazabal and to initiate an interactive process prior to terminating his position. Echazabal, however, did not raise this issue in the district court in opposition to Chevron's motion for summary judgment, and we decline to consider it here. *See Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir.1985) (stating that, subject to limited exceptions, "we will not consider an issue raised for the first time on appeal"). Moreover, it is unnecessary to address this issue in the absence of an opportunity for the district court to address it, given that the grant of summary judgment must be reversed.

### CONCLUSION

For the foregoing reasons, we conclude that disputed issues of material fact re- main with respect to Chevron's obligations under the EEOC's direct threat regulation. We therefore reverse the district court's summary judgment in favor of Chevron and remand for further proceedings consistent with this opinion and the Supreme Court's opinion in *Echazabal*.[13]

### REVERSED and REMANDED.

TROTT, Circuit Judge, dissenting:

In making its decision not to hire Mr. Echazabal, Chevron relied on the recommendation of his own treating physician who agreed with Chevron's examining doctors that the job in question would jeopardize the applicant's health. Mr. Echazabal now attacks not only the opinion of Chevron's doctors, but also the medical opinion of the doctor he chose to treat him. His "ammunition?" Two competing academic opinions never communicated to Chevron in connection with its hiring decision and not produced until the filing of his lawsuit. On this record, I conclude that this past-posted evidence cannot create a genuine issue of material fact as to the equity of Chevron's good faith decision. At best, this lawsuit is a misguided attempt by plaintiff's lawyers belatedly to put Chevron's *and his own* doctors' opin-

---

12. The dissent acknowledges that the expert opinions of Drs. Fedoruk and Gitnick on the one hand, and Dr. Tang on the other, create a dispute as to whether Echazabal could safely work in the refinery. This is precisely the type of dispute which renders summary judgment inappropriate. While the dissent would like us to discount the Fedoruk and Gitnick opinions because they were not presented to Chevron earlier, it relies heavily on the Tang opinion, which was also not before Chevron. In fact, all of these opinions are relevant to the quality of Chevron's decision-making. We also decline the dissent's offer to count up the doctors giving negative assessments because we do not weigh the evidence at the summary judgment stage.

13. The parties agree that the same standards apply under the ADA, the Rehabilitation Act of 1973, and the parallel state law, the California Fair Employment and Housing Act, on the "direct threat" issue. Accordingly, in our prior opinion, we vacated the district court's grant of summary judgment with respect to those other claims as well. 226 F.3d at 1072 n. 12. We also reversed the district court's judgment on the claim for punitive damages. *Id.* Given our reversal of the grant of summary judgment on the ADA claim, we reiterate these dispositions.

ions on trial, an adventure which is not germane on this set of facts to whether Chevron's decision when it was made comported with what the law required. As such, this case stands for the proposition that securing the opinion of a health-compromised job applicant's own treating doctor is not enough to protect an employer from costly litigation, litigation that comes complete with a prayer for punitive damages.

This case is important in the scheme of things, however, not so much because of its mistaken outcome, but for the bodeful implications it has for those to whom this law applies. My colleagues' opinion dismissing the opinions of the doctors upon whom Chevron relied will have a significant pernicious impact on all employers in this Circuit who are doing their best in good faith to comply with the law. Moreover, it will encourage lawyers to choose lawsuits for their clients rather than employment. This counter-productive state of affairs is well described in the joint amicus brief filed with us by the American College of Occupational and Environmental Medicine, the Western Occupational and Environmental Medical Association, and the California Society of Industrial Medicine and Surgery, a brief that demonstrates what is at stake:

> ... An employer is not required, on pain of being held liable for violating the ADA, to second-guess the facially reasonable opinions of competent physicians or to conduct its own full trial of the relevant medical issues each time it must assess whether an employee is qualified or poses a "direct threat."

> \* \* \*

> ... The legal standard urged in this case by plaintiff and the EEOC will neither prevent discrimination, nor protect worker health. Instead, it will place employers in the untenable position of making medical judgments they are not qualified to make, on pain of huge potential liability should a court later conclude (based on after-the-fact testimony) that the employer's judgment was not "accurate." Nothing in the Americans with Disabilities Act supports this result. Reliance on facially reasonable opinions rendered by trained physicians does not become unlawful discrimination merely because allegedly conflicting opinions are later produced.

\* \* \*

Permitting an employer to rely on contemporaneously available and facially reasonable medical opinions does not leave employees powerless against mistaken diagnoses. If the diagnosis is based on erroneous or incomplete information, the employee remains free to present the correct information to the physicians who examined him. The employee is also free to contemporaneously seek the opinions of other specialists and to provide that information to the employer, thus provoking a dialogue with the employer and the original examining physicians that might result in agreement that no significant risk of harm exists. The applicable rule should be drawn in such a way that gives the employee the incentive to seek out and present relevant medical evidence at the time the decision is made—not months or years after-the-fact in burdensome and expensive litigation.

Similarly, if the relevant medical evidence becomes available only after the decision is made, the employee is free to present it to the employer at that time. Should the employer unreasonably persist in an adverse employment decision after receiving information that would make clear to a lay person that the

earlier diagnoses were incorrect, liability under the ADA might be proper. But such liability would be for the later adverse action, not for the original decision.

Hence, I respectfully dissent.

## I

Chevron first discovered Mr. Echazabal's condition in 1992, while he was working at its refinery as an independent contractor. Dr. Philip Baily, Chevron's in-house physician, made this discovery while examining the appellant in connection with an earlier job application and contingent offer of employment in its Coker/Sulfur Acid Division, known as the "coker unit." Dr. Baily had studied toxicology at the University of Texas and was Board Certified in preventative occupational medicine. On the basis of a standard comprehensive medical examination of Mr. Echazabal, including lab tests, Dr. Baily found that Mr. Echazabal's liver function was "grossly abnormal" and concluded that he should not be exposed to liver toxic chemicals or alcohol. After Dr. Baily's examination, Mr. Echazabal consulted at Chevron's suggestion with his own doctors who confirmed the diagnosis, and he began long-term treatment in 1993 for his condition in the GI Hepatology Department of HealthCare Partners Medical Group.

Dr. Baily eventually opined that:

A healthy individual can be expected to withstand this exposure with no significant health risk. But given Mr. Echazabal's history of a long term liver problem, his diagnosis of chronic active Hepatitis C, and significantly elevated liver enzymes over a period of years, he had a reduced liver function as demonstrated by lab test results, [so] he would be far more at risk than a person who had normal liver function and was performing the duties of a plant help-er. . . . [F]urther exposure to hepatotoxic chemicals and solvents would further damage his already reduced liver capacity and seriously endanger his health. Small exposures over a long period of time would pose a health hazard for him. Also, a single event large exposure (for example, as a result of a ruptured pipe, a relief valve popping and venting, a fire, explosion or other emergency situation) could by itself significantly injury him and potentially cause his death.

Dr. Baily's findings and conclusions were recorded in Chevron's records. Based on Mr. Echazabal's medical unsuitability for the job, Chevron rescinded its offer.

## II

### A.

Some years later, on December 28, 1995, Chevron again offered Mr. Echazabal a job in the coker unit, in its El Segundo refinery for which he had again applied, but, as in 1992, the offer was contingent on the results of a standard pre-employment physical examination. The offer was apparently made without knowledge of Mr. Echazabal's medical history. Enter Dr. Kenneth McGill, Dr. Baily's successor. Dr. McGill had thirty years of experience as a physician. Dr. McGill had worked at the refinery clinic for ten years and was personally familiar with the conditions and demands of the work at issue. On the basis of a thorough medical examination, a review of blood tests, and a discussion with Mr. Echazabal's own doctor, Dr. McGill determined—as had Dr. Bailey—that the chemicals and solvents to which Mr. Echazabal would be exposed at the refinery would further aggravate his reduced liver capacity and seriously endanger his health and his life.

Dr. McGill then discussed his findings and conclusions with Dr. T.L. Bridge, Chevron's Medical Director in San Francisco. Dr. Bridge, whose specialty was occupational medicine, agreed with Dr. McGill's and Dr. Baily's assessments that Mr. Echazabal could not safely work as a plant helper in the coker unit at the refinery. Not a single doctor disagreed with this focused conclusion. Mr. Echazabal did not offer any evidence or information to the contrary.

The record leaves no doubt that Dr. McGill's evaluation constituted an individualized assessment of Mr. Echazabal's medical suitability for the job. Dr. McGill's assessment included (1) a review of Mr. Echazabal's medical charts documenting examinations and information received by Chevron between 1992 and 1996, including Dr. Baily's findings; (2) an updated medical history of the applicant as of 1996; (3) numerous blood tests administered over many years showing abnormal results indicating liver cell damage; (4) a review of a current liver function test; and most importantly, (5) Chevron's job summary and physical/environmental demands specifications for the particular job sought, as well as Dr. McGill's own knowledge of the position.

### B.

But, here is the clincher: in addition to the five sources of information listed above, Dr. McGill contacted also Mr. Echazabal's own treating physician, Dr. Zelman Weingarten, at HealthCare Partners Medical Group, where Mr. Echazabal had been a hepatitis patient for almost three years after Dr. Baily discovered his illness. Dr. Weingarten, who had no connection to Chevron, advised against this job because of its risks to his patient's health, as the following exchange of information demonstrates.

At their first meeting, Mr. Echazabal admits that Dr. McGill told him he needed more information from his treating doctors. Accordingly, Dr. McGill sent a letter dated January 10, 1996, to the person originally identified by Mr. Echazabal as his treating physician at HealthCare Partners, Dr. Mordo Suchov. This letter requested relevant information about Mr. Echazabal, but Dr. Weingarten, who unbeknownst to Dr. McGill had taken over for Dr. Suchov, had already mailed to Chevron Corporation a "To Whom it May Concern" letter dated also January 10, 1996. Dr. McGill's and Dr. Weingarten's letters obviously crossed in the mail, and, when he read it, Dr. McGill believed that Dr. Weingarten's January 10th letter, which focused on whether the disease was contagious, was not responsive to his written inquiry of the same date. Dr. McGill's letter, which demonstrates an interest in Mr. Echazabal's well being, not in whether he was contagious, reads in relevant part as follows:

January 10, 1996

Dear Dr. Suchov:

I've been informed that an applicant for employment, Mario Echazabal, has been under your care for abnormal hepatic function and continuing treatment relative to hepatitis C.

Mr. Echazabal is re-applying for work at Chevron after a three year interim of treatment. This clinic had done an extensive work-up, including communications with the treating doctors at that time. In order to consider his present application we will need recent results of his current liver function tests and a short letter from yourself giving the present diagnosis, condition and prognosis.

The job Mr. Echazabal has applied for may entail exposure to hepatotoxic hy-

drocarbons, thus we would appreciate your opinion as to whether this exposure would be a risk to his present liver condition.

Enclosed please find authorization for release of medical information signed by the applicant. A self-addressed, stamped envelope is enclosed for your convenience in replying. Any charges for this information would remain the responsibility of the applicant. Thank you for your assistance and cooperation in this matter.

Thus, when he reviewed Dr. Weingarten's January 10, 1996, non-responsive letter that clearly had been written before Dr. Weingarten received this inquiry, Dr. McGill personally called Dr. Weingarten and queried him about the dispositive issue: could Mr. Echazabal safely work around hepatotoxic hydrocarbons. Dr. Weingarten's response was that Mr. Echazabal "shouldn't be exposed to these hydrocarbons." I find no factual challenge to this evidence in the record.

Here are relevant excerpts from Dr. McGill's deposition:

By Mr. Minsky

Q Correct me if I'm wrong, but I assume the letter between Dr. Weingarten and you passed in the mail; right?

A That's sure what happened.

Q So you get Dr. Weingarten's letter of January 10. When do you call Dr. Weingarten?

A Can't give you an exact date.

Q You don't recall?

A No. I don't recall when exactly.

Q Well, do you recall—do you have anything to refresh your recollection as to when?

A Let me elaborate on the sequence of these letters and contact. I think that would be better.

Q Before you do that, let me clarify. Did you actually speak with Mr. Weingarten, or did you speak with somebody from his office to get some lab results? Let me see if I can help you here.

A Well, I can answer it.

Q Okay.

A Both. I don't know if the lab results were his office or from the laboratory.

Q Okay. Go ahead, and tell me the sequence.

A Yes. As you pointed out, the two letters had crossed. Therefore, Dr. Weingarten wasn't replying to my letter. In fact, you know, it's a "To Whom it May Concern" letter. And therefore, I wanted to make sure that Dr. Weingarten either received the letter, and possibly forwarded it on to Mr. Suchov.

* * *

So I don't recall exactly the chain of events. But we determined that Suchov was no longer caring for Mr. Echazabal, and that Dr. Weingarten was the primary doctor at this time. And as the time was going by, I don't know when we got this January 10th letter, there's no date stamp on it, I called, and you know, got ahold of Dr. Weingarten briefly on the phone to try to straighten out the matter of whether he'd gotten my letter or not. And at the time I spoke with him, my impression was that he hadn't got the letter forwarded to him, but that he would get it all right.

Q Go ahead.

A And so I had verbally either read the paragraph in my letter or paraphrased it asking him to respond to our concern. Let me scratch that, and put it a different way.

*I wanted to make sure that he understood that our concern was the exposure to hepatotoxic hydrocarbons, and not the contagion issue which he had responded to in his letter here.* And so I was able to get across to Dr. Weingarten that that was one of my interests, and *he replied, paraphrased again, but pretty well as he replied in the subsequent letter [of February 28, 1996] that if that was the case then he shouldn't be exposed to these hydrocarbons.* And I, you know, expected the forthcoming letter *to follow-up my telephone conversation.* Now, I can't tell you the time sequence of that.

Q So you have no—

A It's in between there somewhere. It's just that, you know, I realized that this had crossed, and that this letter wasn't addressing our concern at Chevron about the exposure. And I wanted to make sure that Dr. Weingarten knew that that's what I wanted him to know. And would he please reply to that in addition to what he had in this January 10th letter. That's my best recollection of what occurred, and the sequence of how it happened.

The "forthcoming letter" from Dr. Weingarten referred to by Dr. McGill with respect to Dr. Weingarten's opinion did eventually arrive in Dr. McGill's office. That this letter was addressed to Dr. McGill, not just Chevron Corporation, demonstrates that it was a confirmation of their earlier telephonic conversation as re-

lated by Dr. McGill. The letter reads as follows:

February 28, 1996

Kenneth McGil [sic], M.D.

Chevron USA Products Company

El Segundo Refinery

324 West El Segundo Blvd.

El Segundo, CA 90245

Attn: Medical Clinic

Re: Mario Echazabal

 S.S. # XXX–XX–XXXX

 M.R. # 1–H102214

Dear Dr. McGill:

In response to your letter of 1/10/96, I would like first to refer to the letter we sent you on 1/10/96, which it appears has not reached your desk (I am including a copy of that letter for your evaluation). Mr. Echazabal has been treated here in the past for chronic active hepatitis secondary to hepatitis C. Although he received extended periods of Interferon therapy, the problem was not cleared. During the last physical examination, we found the patient to be in good general health without any changes and no evidence of liver failure. I had recommended at the time for him to be allowed to return to work and to his usual activities, and I recommended some general measures. *In your letter, it is mentioned that Mr. Echazabal has applied for return of his job and it mentioned that "this may entail exposure to hepatotoxic hydrocarbons." This, of course, is recommended not to be the case.*

If we can be of any assistance, please do not hesitate to contact us.

Sincerely,

[signed]

Zelman Weingarten, M.D.

### C.

Chevron's Personnel Director, William Saner, who is not a medical doctor, made the final decision for Chevron to withdraw the contingent offer of employment. He so notified Mr. Echazabal on February 6, 1996. Mr. Saner made this decision after reviewing the record and consultation with Dr. McGill. The reason for his decision was the risk of the job. To quote Mr. Saner, "The risks would be exposure to hydrocarbons, assorted chemicals, solvents, toxins; and that based on the medical evaluation of the liver, that he may not be able to cleanse his body with the existing capacity of his liver." I note here that the chemical agents referred to by Mr. Saner were the agents Mr. Echazabal himself reported to the doctors on his medical history questionnaire as the chemicals with which he would come into contact in this job.

More importantly, Mr. Saner made his decision as noted on the basis of Dr. McGill's recommendation which relied in large part on Dr. Weingarten's opinion. I quote Mr. Saner from his uncontradicted deposition of September 10, 1997:

By Mr. Turner:

Q During this January and February 1996 time period, at some point in time *did you have an understanding that Mr. Echazabal's physician had in fact recommended he not be exposed to solvents, toxins and the like?*

A *Dr. McGill instructed or told me that he had had that conversation and had that information and had that directed from his doctor; yes.*

Q *Did that impact, in any way, the decision that you made to withdraw the job offer?*

A *Very much so.*

Here I note that according to Dr. Weingarten, Mr. Echazabal had been "followed in the GI Hepatology Department for several years with a history of chronic active hepatitis, secondary to Hepatitis C. He has been treated for extended periods with Interferon without clearance of the problem." As far as I am concerned, these salient facts when added to the rest of the evidence renders as a matter of law Chevron's medical judgment not to hire Mr. Echazabal both reasonable and based on the best available objective evidence.

### III

### A.

Years later, in connection with this lawsuit, Mr. Echazabal has produced the conflicting opinions of two experts, Doctors Fedoruk and Gitnick, no doubt qualified generally to speak on the issue of liver conditions and their relation to exposure to toxic chemicals. Given this detailed and comprehensive factual record, however, and Chevron's reliance at the time on Mr. Echazabal's own treating physician, as well as their own doctors, I conclude that as impressive as these experts' credentials might be, their opinions are not relevant to the bona fides and quality of Chevron's decision not to hire Mr. Echazabal.

To begin with, in contrast to Dr. Weingarten, neither Dr. Fedoruk nor Dr. Gitnick was Mr. Echazabal's treating physician. Moreover, I learn from their respective depositions that neither Dr. Fedoruk nor Dr. Gitnick medically examined this appellant. Dr. Fedoruk only "met and spoke" with him, and Dr. Gitnick reviewed only his deposition. As Judge Reinhardt reminded us in a different context in *Ghokassian v. Shalala*, 41 F.3d 1300 (9th Cir.1994), "We have accorded deference to treating physicians precisely because they are the doctors

with 'greater opportunity to observe and know the patient.'" *Id.* at 1303 (quoting *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir.1983) (internal quotation omitted)). *See also Black & Decker Disability Plan v. Nord,* —— U.S. ——, ——, 123 S.Ct. 1965, 1971, 155 L.Ed.2d 1034 (2003) ("[I]t may be true that treating physicians, as a rule 'ha[ve] a greater opportunity to know and observe the patient as an individual.'")[1]

## B.

Furthermore, Mr. Echazabal's experts surfaced for the first time in opposition to Chevron's motion for summary judgment. Their information was never brought to Chevron's attention in connection with its decision to withdraw the job offer or in an attempt to convince it to reconsider, and the experts never talked to Doctors Baily or McGill. The only input Mr. Echazabal offered during the decision making process was the opinion of his treating physician, and he agreed with Dr. McGill. It is nothing short of astonishing to permit the opinions of Mr. Echazabal's Johnny–Come–Lately experts to shed light on the bona fides of Chevron's decision.

All Dr. Gitnick and Dr. Fedoruk demonstrate is a common lawsuit-induced dispute between doctors. What a surprise. What is a surprise is that Mr. Echazabal's litigation doctors disagree with his treating doctors. To add to the inevitable battle of experts, we have Dr. Brian Tang. Dr. Tang, a certified medical specialist in occupational medicine trained in toxicology and educated at John Hopkins School of Medicine, came also to the conclusion that Mr. Echazabal has a condition that will be "worsened by ... exposure[to hepatotox-ins], causing probable death." He did so in consultation with his colleague Dr. Socol after Mr. Echazabal was sent in 1996 to their clinic for a hands-on medical evaluation. He and Dr. Socol agreed that Mr. Echazabal should not be exposed to chemicals in a refinery, and Dr. Tang consulted scholarly journals in forming his opinion. This places at least six doctors in support of Chevron's decision.

Dr. Tang, who taught occupational preventative medicine at the University of Southern California School of Medicine in Los Angeles was as adamant as University of California employed Doctors Fedoruk and Gitnick:

By Mr. Minsky

> Q Is it your opinion that no one can work at a refinery if somebody has elevated enzyme levels?
>
> A It's my opinion that a person should not work in a refinery if he is going to be exposed to hepatotoxins, but he can work in a refinery if he is not going to be exposed to hepatotoxics.
>
> Q Irrespective of their enzyme level?
>
> A That's correct. If his liver enzymes are elevated, but he's not going to be exposed to hepatotoxins, then he should be able to work in a refinery. But, if he is going to be exposed to hepatotoxins, and has elevated liver enzymes, he should not be working there.
>
> \* \* \*
>
> Q Is your belief that Mr. Echazabal risks injury or death, true for anybody that has an enzyme level of 177?

---

**1.** *Black & Decker* declined to apply to ERISA the rule adopted by the Commissioner of Social Security that accords "special weight" to a claimant's treating physician. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2002). Here, this issue is not a question of rules or of deference, but of the facts of a case where the issue is the employer's behavior.

A Yes.

* * *

Q Are you able to tell me whether you think it would be a substantial risk of injury to him?

A Any risk is substantial when it involves your health and your life is on the line. This is a case where you make one mistake and he's history and I did not want that to happen to this patient.

Current scientific literature on this subject amply supports Chevron's doctors and Mr. Echazabal's treating physician. Both the 1992 Second Edition and the 1998 Third Edition of the textbook *Environmental and Occupational Medicine* consistently describe exposure in the workplace to hepatotoxins as a cause of serious damage to the liver. This book notes also that frequently the dangers do not manifest themselves in symptoms until "the end." Here are some relevant excerpts from the Third Edition:

### Toxic Liver Disorders

The liver's central role in total health status makes it vulnerable to a wide variety of environmental and occupational hepatotoxic results.

* * *

People with acute toxic liver disorders frequently have nonspecific chemical manifestations and those suffering from chronic liver injury usually are asymptomatic until the disease progresses to its end stage. Sometimes toxic liver disorders are inferred in certain environmental settings.... Simultaneous exposure of agents such as viral hepatitis and/or alcohol and drug abuse, may confound the liver disorder caused by the specific occupational or environmental hepatotoxic agent.

### Chemically Induced Liver Disorder

Human liver disorders caused by chemicals have been recognized for more than a century.

* * *

Hepatotoxic chemicals are encountered in a variety of occupations, including painting, textile, and dye manufacturing. More than 100 chemicals have been found to be toxic to the liver in occupationally exposed workers.

* * *

... The synthetic hepatotoxic chemicals include therapeutic drugs, pesticides, metals, ethanol, and industrial chemicals. Among the industrial chemicals are classes of agents, such as aromatic hydrocarbons, halogenated hydrocarbons, chlorinated aromatic compounds, and nitro compounds.

* * *

Chemically induced liver disorders can be acute, subacute, and chronic hepatic injuries based on their clinical presentations, and specific hepatotoxins may induce both acute and chronic lesions.

WILLIAM N. ROM, ENVIRONMENTAL & OCCUPATIONAL MEDICINE 831, 834 (3d ed.1998)

### C.

The record reveals without dispute that if hired to work in the coker unit, Mr. Echazabal will be exposed to hepatotoxins. Ron DiPadua, a Shift Supervisor in the Coker/Sulfur Acid Division where Mr. Echazabal would work in the job at issue described in his deposition a workplace rife with caustic chemicals, stating also that "[t]here is also a risk of a major event, e.g., major leak, fire or explosion. These

occur only very infrequently but can result in a plant helper in the coker unit having major exposure to the chemicals and products used and produced in these operations." Mr. DiPadua summed up his information as follows:

> ... There is no way to perform the functions of a plant helper without being exposed to this environment including hydrocarbons, chemicals and solvents. Exposures to some of these substances arises from plant helpers using them directly. Additional exposure results from being in a work area when others are using them. I am informed and believe, based on a review of the Declaration of Kenneth McGill, M.D., which is being filed with the court together with this declaration, that a healthy individual can be expected to withstand this exposure with no significant health risk. But a person with a long term liver problem, a diagnosis of chronic active Hepatitis C, and reduced liver function would be far more at risk than a person who had normal liver function and was performing the duties of a plant helper.

Is Mr. DiPadua's statement about a "major event" or an "explosion" relevant? Yes. I quote Dr. Gitnick: "I am also aware that while working at the refinery, and specifically at the coker unit, Mr. Echazabal was repeatedly exposed to leaks and on at least one occasion an explosion." Mr. Echazabal confirmed this event in his deposition, identifying the explosion as having been in one of the coke drums. The explosion was "bad" and "sent people to the hospital."

### D.

The majority's logic is inconsistent at best. On one hand, Dr. Weingarten's treating physician opinion evidence is of little moment, but Doctors Fedoruk's and Gitnick's non-treating opinions, of which

Chevron was not aware and which were offered long *after* Chevron made its decision, have substantial value. Based on common sense, as well as our required focus on "the best available objective evidence," I see it the other way around: Weingarten's individualized evidence summing up his patient's long-term treatment in his practice's GI Hepatology Department, in conjunction with Dr. Baily's, Dr. McGill's, and Dr. Bridge's opinions, is dispositive: Chevron made its objective decision after appropriately and thoroughly considering all the relevant factors.

Seen for what it is, Mr. Echazabal's argument is for a heightened standard that would have required Chevron's doctors to search out an outside expert to confirm their unanimous opinion. Nowhere does the law require such a step so long as what Chevron's doctors did was objectively reasonable under the circumstances. In any event, however, Chevron's doctors—not lay persons—did exactly what Mr. Echazabal now calls for: they called Mr. Echazabal's *own* treating doctor who confirmed their conclusions. If Dr. Weingarten—and the GI Hepatology Department of Heath-Care Partners—was good enough as a long-term treating physician for Mr. Echazabal, why not for Chevron? What could be better than the recommendation of his own treating doctor that he not have the job? Notable here is the fact that Dr. Suchov and Dr. Weingarten had been treating him since 1993. Mr. Echazabal had gone to them when he had been told to seek out a liver specialist for treatment. On this record, ending the process with Dr. Bridge did not render it defective or unreasonable.

### IV

The majority opinion suffers from another factual error. The opinion claims that "Chevron's doctors were unfamiliar with

the risks of Echazabal's position." The opinion suggests also that Chevron's doctors were unaware of the types and concentrations of toxins to which a worker in the coker unit would be exposed. These assertions are flatly misleading. I quote from Dr. McGill's declaration dated August 25, 1997, which details his precise knowledge of the chemical exposure related to this job:

The refinery creates and maintains job summaries with respect to every position at the El Segundo Refinery. These include descriptions of what employees need to be able to do in particular jobs and, where appropriate, what environmental conditions they will encounter. I knew Mr. Echazabal was applying for a position to become a coker plant helper so from our manual I obtained the summaries regarding that position. A true and accurate copy of the applicable Job Summary (Form GO–400) is attached as Exhibit 16. A true and accurate copy of Chevron's Physical/Environmental Demands (form GO–308–ES) is attached as Exhibit 17. These summaries are prepared in the normal course of business and are used and relied upon by the medical clinic in connection with assessing whether applicants for jobs are capable of safely performing the required functions. The information in these two summaries were consistent with my general understanding and enhanced my knowledge of the coker plant helper position and its requirements. In particular, the Physical–Environmental Demands (form GO–308–ES), which was updated on December 1, 1993, addressed the issue of Airborne Contaminants & Chemicals in the work environment, listing: "Hydrocarbon Liquids & Vapors, Acid, Caustic, Refinery, Waste, Water and Sludge, Petroleum, Solvents, Oils, Greases, Chlorine, Bleach." Given Mr. Echazabal's medical history, his im-

paired liver function as evidenced by lab tests in his chart and his diagnosis of chronic active Hepatitis C, I was concerned about whether he could work in the environment at the coker unit and provide the services required of a plant helper without endangering his own health. A plant helper in the coker unit is exposed to chemicals and solvents including several that are hepatotoxic, that is, damaging to the liver. A healthy individual can be expected to withstand this exposure with no significant health risk. But given Mr. Echazabal's history of a long term liver problem, his diagnosis of chronic active Hepatitis C, and significantly elevated liver enzymes over a period of years, he had a reduced liver function as demonstrated by lab test results, he would be far more at risk than a person who had normal liver function and was performing the duties of a plant helper. My concern was that further exposure to hepatotoxic chemicals and solvents would further damage his already reduced liver capacity and seriously endanger his health. Small exposures over a long period of time would pose a health hazard for him. Also, a single event large exposure (for example, as a result of a ruptured pipe, a relief valve popping and venting, a fire, explosion or other emergency situation) could by itself significantly injure him and potentially cause death. In short, hepatotoxic exposure to a person like Mr. Echazabal with an already impaired liver suffering from a progressive liver disease such as chronic active Hepatitis C could be fatal. One of the liver's primary functions is to filter poisonous substances from the body. Given the existence of numerous potential toxic substances at the refinery, even if not specifically liver toxic, a person with an impaired liver would be less able to de-

toxify such an exposure. This circumstance by itself carries the risk of serious injury or death.

## V

I agree with the district court that Mr. Echazabal has no case, and I do so for three primary reasons. First, Mr. Echazabal is clearly not "otherwise qualified" for the work he seeks. Why? Because the job most probably will endanger his health. I do not understand how we can claim he can perform the essential functions of the position he seeks when precisely because of his disability, those functions may harm him. As a matter of law, Chevron has carried its burden of establishing a "direct threat" defense.

I would follow here the sound logic, reasoning, and policy of the Seventh Circuit in *Knapp v. Northwestern University*, 101 F.3d 473 (7th Cir.1996). In *Knapp*, the plaintiff, an outstanding basketball player on an athletic scholarship, developed a heart condition that necessitated the implantation of a cardioverter-defibrillator in his abdomen. The purpose of this device was to restart his heart should it succumb under stress to cardiac arrhythmia or arrest. Based on these facts, Northwestern University and the Big Ten Athletic Conference declared Knapp permanently medically ineligible to play basketball, but his scholarship continued. Knapp sued Northwestern, claiming on the basis of favorable evidence from his medical experts that Northwestern's contrary medical decision had violated section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. "Presented with conflicting evidence, the district court found Knapp medically eligible and Northwestern in violation of the Rehabilitation Act." *Id.* at 477. The district court then entered a permanent injunction on Knapp's behalf "prohibiting Northwestern from excluding Knapp from playing on its basketball team for any reason relating to his cardiac condition." *Id.* The district court said with respect to the conflicting medical evidence that its

> task is to consider all the opinions and determine which are most persuasive. It is what the trial of disputes such as this will sometimes require. It might have been better to have left the choice to a panel of physicians, but Congress left it with the courts....

*Id.* at 484.

The Seventh Circuit disagreed:

> We disagree with the district court's legal determination that such decisions are to be made by the courts and believe instead that medial determinations of this sort are best left to team doctors and universities as long as they are made with reason and rationality and with full regard to possible and reasonable accommodations. In cases such as ours, where Northwestern has examined both Knapp and his medical records, has considered his medical history and the relation between his prior sudden cardiac death and the possibility of future occurrences, has considered the severity of the potential injury, and has rationally and reasonably reviewed consensus medical opinions or recommendations in the pertinent field—regardless whether conflicting medical opinions exist—the university has the right to determine that an individual is not otherwise medially qualified to play without violating the Rehabilitation Act. The place of the court in such cases is to make sure that the decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury, not to determine on its own which evidence it believes is more persuasive.

\* \* \*

We do not believe that, in cases where medical experts disagree in their assessment of the extent of a real risk of serious harm or death, Congress intended that the courts—neutral arbiters but generally less skilled in medicine than the experts involved—should make the final medical decision. Instead, in the midst of conflicting expert testimony regarding the degree of serious risk of harm or death, the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence.

\* \* \*

In closing, we wish to make clear that we are *not* saying Northwestern's decision necessarily is the right decision. We say only that it is not an illegal one under the Rehabilitation Act. On the same facts, another team physician at another university, reviewing the same medical history, physical evaluation, and medical recommendations, might reasonably decide that Knapp met the physical qualifications for playing on an intercollegiate basketball team. Simply put, all universities need not evaluate risk the same way. What we say in this case is that if substantial evidence supports the decision-maker—here Northwestern—that decision must be respected.

*Id.* at 484–85.

Accordingly, the Seventh Circuit concluded as a matter of law that Knapp was not "otherwise qualified" to play basketball. Parenthetically, Chevron's case is stronger than Northwestern's in that Chevron consulted with Mr. Echazabal's own long-term treating physicians who concurred in Chevron's judgment.

Our own related case law supports my analysis. In *Mantolete v. Bolger*, 767 F.2d 1416, 1422 (9th Cir.1985), we said, "[I]n some cases, a job requirement that screens out qualified handicapped individuals on the basis of possible future injury is necessary." We then said,

In applying this standard [of a reasonable probability of substantial harm], an employer must gather all relevant information regarding the applicant's work history and medical history, and independently assess both the probability and severity of potential injury. This involves, of course, a case-by-case analysis of the applicant and the particular job.

*Id.* at 1423. Chevron followed this formula to the letter, capping off its inquiry with information from the best possible source—the applicant's treating doctor.

Second, Chevron has on these facts, as I have already explained, a dispositive defense to this action, known as the "direct threat" defense. 42 U.S.C. § 12113(b). The EEOC's implementing regulations, authorized by Congress, defines a "direct threat" to mean "a significant risk of substantial harm to the health or safety of *the individual* or others that cannot be reduced by reasonable accommodation...." 29 C.F.R. § 1630.2(r) (emphasis added). *See also Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 84–86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (holding that threats to the individual are included in § 12113(b)'s "direct threat" defense).

Third, the ADA provides a defense to employers who can demonstrate that an accommodation constitutes an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). I believe it would be an undue hardship as a matter of law to require an employer to place an employee in a life-threatening situation. Such a rule would require employers knowingly to endanger workers. Our law books, both state and federal,

overflow with statutes and rules designed by representative governments to protect workers from harm. In many jurisdictions, it is a crime knowingly to subject workers to life-endangering conditions. California Labor Code § 6402 expressly forbids an employer from putting an employee in harms way. California Penal Code § 192, has been used to prosecute employers in the event of the death of an employee subjected to dangerous working conditions. *Granite Const. Co. v. Superior Court*, 149 Cal.App.3d 465, 197 Cal.Rptr. 3 (1983). In Arizona, an employer who fails to provide a safe workplace commits a felony. Ariz.Rev.Stat. Ann. §§ 23–403, 23–418.

## CONCLUSION

At this juncture in this litigation ordeal, I vote to affirm the district court across the board. I cannot imagine what would have happened to Chevron under these circumstances had Mr. Saner hired this applicant against the recommendation of his own and Chevron's doctors and the applicant's condition had then deteriorated—or then again, maybe I can. I would hope that the law is not a heads-I-win, tails-you-lose game. The purpose of summary judgment is to put an early end to lawsuits not supported by facts. That should be the fate of this one. Instead, the remand is for a trial where the issue will involve conflicting medical opinions regarding hepatotoxins, or a battle of experts, rather than what it should be: whether or not Chevron unlawfully discriminated against this plaintiff.

Thus, I respectfully dissent.